COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

R.J. FITZGERALD & CO., INC.; Raymond Fitzgerald; Leiza Fitzgerald; Greg Burnett; Al Coringrato; and Chuck Kowalski, Defendants.

No. 99–Civ–1558–T–MSS.

United States District Court,
M.D. Florida,
Tampa Division.

May 21, 2001.

Stephen M. Humenik, David A. Reed, Commodity Futures Trading Commission, Washington, DC, Joan M. Manley, Peter M. Haas, Washington, DC, for plaintiff.

Constantine John Gekas, Alenna K. Bolin, Gekas & Associates, Ltd., Chicago, IL, for defendants.

## ORDER

SCRIVEN, United States Magistrate Judge.

This case was tried on February 26—March 19, 2001[1]. The court has reviewed the parties' submissions, the evidence and testimony presented at trial, as well as the designated exhibits. Pursuant to Fed. R.Civ.P. 52, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### *THE DEFENDANTS*

1. R.J. Fitzgerald & Co., Inc. was a full-service introducing broker during all times relevant to the allegations brought here. It was guaranteed[2] by futures and commodities merchant, Iowa Grain beginning in 1992 and at all relevant periods. R.J. Fitzgerald & Co., Inc. ("RJFCO") was opened in November 1992 and unquestionably opened as a successful introducing broker from 1992 until at least 1998. It operated as a legitimate business whose primary market focus was to serve small accounts customers with relatively little experience in the commodities market.

2. Raymond James Fitzgerald was at all times the sole shareholder, owner and operator of RJFCO. He was principally responsible for all decisions, actions, and trading recommendations made or entered into by the firm. He expressly approved by his endorsement virtually all trades entered by brokers on behalf of clients of the firm.

3. Leiza Fitzgerald was not a principal, shareholder officer, owner or operator of RJFCO at any time, nor was she responsible for any supervisory duties during her several absences due to illness, accidents, pregnancy complications, childbirth and sick leave. When

---

1. The parties consented to proceed before the Magistrate Judge pursuant to Title 28, United States Code, Section 636(c) and Fed.R.Civ.P. 73.

2. As the registered futures commission merchant, Iowa Grain accepts orders to buy or sell futures contracts or options on futures and accepts money or other assets from customers to support such orders. Additionally, Iowa Grain guarantees performance by RJFCO with respect to the solicitation of and transactions involving customers and foreign options customer accounts of the introducing broker.

she was not on leave, her responsibilities were limited to the preparation of training materials and for training the sales brokers. She diligently sought and obtained approval of RJFCO's training materials from Iowa Grain compliance officers.

4. Greg Burnett was an associated person ("AP") with RJFCO holding both a Series 3 and Series 30 license. His responsibility was primarily to supervise the broker/traders. His supervisory experience was extensive though mostly limited to the securities market. Prior to joining RJFCO, Burnett was employed as a registered representative with the firm F.N. Wolf and held both Series 7 and Series 62 licenses. Burnett next went to the securities firm Olde Financial, where he started as a registered representative and was promoted up the ranks to registered representative in charge, branch manager, and, ultimately, to regional manager over seven branch offices. His responsibilities included broker hiring, compliance monitoring and audits, trade approvals, suitability determinations and branch office audits. Throughout his career in securities, he dealt with the options market extensively. During his tenure at Olde Financial he obtained his Series 24 (NASD principal's license) and Series 8 licenses (Branch Manager license) and received all the compliance training attendant with such licensure. After resigning from Olde due to personal problems, Burnett briefly did consulting work, for Morgan Stanley Dean Witter, on compliance issues. His next post was as trading supervisor for RJFCO, where he approved trade tickets, monitored telephone calls, directly observed the traders and eventually managed client accounts. During his tenure at RJFCO he held both the Series 3 and Series 30 licens-

es, and as part of his training for RJFCO, he spent a week at Iowa Grain observing operations, including compliance procedures. He also underwent additional training on compliance rules specific to the commodities market in connection with obtaining these licenses. He was well qualified to serve as supervisor of traders and brokers at RJFCO.

5. Chuck Kowalski was RJFCO's chief market analyst during all relevant time periods. His responsibility was to study the various commodities markets and develop firm recommended trades or trading strategies, which were then proposed to clients through the broker/traders. All such recommendations were then considered for approval by Raymond Fitzgerald subject to the client's ultimate approval. Kowalski had at his disposal sufficient market resources to aid in fundamental as well as technical analysis of the commodity market. In developing trade recommendations, Kowalski typically relied on the following sources: the Future Source Technical (a trading software program for technical analysis), the Wall Street Journal, Barons, Investor's Business Daily, the Hightower Report, Smith Barney, 20 different Internet sites for 20 different market (with some overlap). He also consulted, in some instances, with another analyst available to the firm, Jim Dahir.

6. The other brokers and traders at RJFCO had access to much of the same information though they relied upon Mr. Kowalski's trade recommendations in many instances, particularly in the trades that lie at the center of this dispute. Traders were not, however, required to accept and only recommend Kowalski's developed firm trades. Brokers were permitted to,

and often did, recommend trades and strategies other than those chosen by Kowalski, with the approval of Raymond Fitzgerald. In addition, some clients directed their own trades. All trades were pre-approved by clients before they were placed.

7. RJFCO operated in perhaps a unique manner in that it employed one team of sales brokers primarily responsible for generating customers via telephone solicitations. As a separate function, a second team of broker/traders handled all of the actual trades and account monitoring functions. Both sets of brokers were required to be Series 3 licensed. Despite the Commission's suggestions during its opening statements of the trial, no evidence was adduced at trial to establish that this bifurcated system of account management was for a nefarious or improper purpose. Mr. Fitzgerald and Mr. Kowalski testified persuasively that the purpose was to have less experienced brokers solicit clients while slightly more or significantly more experienced brokers interfaced with clients on issues related to trading and account monitoring and to allow traders to focus on trades, not on customer solicitation or "cold calling." Defendants established that the bifurcated system worked as designed with newer brokers having no substantial involvement in account trading and management.

8. Because all RJFCO brokers and supervisors were required to be licensed as Series 3 commodity brokers, all were required to pass the NFA Series 3 Exam before serving as a sales or trading broker. In addition, all RJFCO supervisors were required to and did take and pass the National Association of Securities Dealers/NFA Series 30 Branch Office Manager Exam. Both the Series 3 and Series 30 examinations dealt extensively with NFA rules and regulations. The Series 30 materials dealt extensively with compliance issues. RJFCO supplied to incoming employees the Series 3 Exam preparation manual and trained brokers in preparation for the exam. This training, conducted for most of the relevant period by Fred Fykes, was extensive and thorough, covering a wide range of topics, such as futures trading theory, basic functions terminology, futures margins, option premium price limits, futures settlements, types of orders, customer accounts, price analysis, basic calculations, hedging commodity futures, speculating in financial monetary futures, speculating in commodity futures, options hedging, CFTC and NFA regulations. Traders were also required to watch a four hour compliance video and complete a workbook based on the videotape as part of a continued professional education requirement.

9. Every new employee of RJFCO received a copy of RJFCO's compliance manual along with instructions to read and acknowledge that they read it, and all agreed to abide by it. Adequate and reasonable procedures were in place to ensure that brokers followed the mandates of these compliance standards.

10. The company diligently trained its employees to follow the standards of the industry as established in NFA regulations. For instance, the company had a policy, which it consistently stressed to its employees, against guaranteeing profits to prospective customers and clients. No evidence was offered to the contrary.

11. RJFCO's assertions to consumers of its resources, experience, credentials and services offered and rendered,

though somewhat exaggerated by sales puffing, were largely substantiated at trial and were in no way false, misleading or deceptive or intended to be so.

12. Prior to the time period alleged in this action, RJFCO had a very competitive and very clean compliance record. Evidence established very few formal complaints lodged against RJFCO with the NFA and only slightly more informal complaints and reparation demands by clients.

13. The Commodity and Futures Trading Commission ("CFTC"), the National Futures Association ("NFA") and Iowa Grain conducted periodic audits with the firm, finding no significant irregularities in operations or compliance in the time periods that predate the window period challenged in this enforcement action. Such audits occurred on August 12, 1996, nine months after inception of the alleged scheme to defraud, again at the end of 1997 and at the end of April 1998. Iowa Grain's principal compliance officer during the relevant time period was Anne Farris. Ms. Farris preapproved all promotional material now challenged by the CFTC in this action except the video version of the challenged CNBC promotional advertisement that aired approximately two weeks in March 1998.

14. It was the firm's policy to disclose consistently to customers the high risks inherent in the commodity trading market. The predominant evidence is that the firm's policy of requiring customers to read and endorse risk disclosure statements prior to opening accounts, was strictly enforced. In fact, Mr. Fitzgerald personally reviewed each new client packet for compliance. Further, risk disclosure booklets ("booklet 2") were sent to every client. Clients were required to certify by signature that they had read the disclosures and were aware of the risks before they were allowed to open accounts with the firm. The evidence established either conclusively or by a preponderance of the evidence that as to all the individual customers put forth by the CFTC, all received and had an opportunity to review booklet 2—the risk disclosure booklet.

15. As it pertains to customer Robert Bingham, the evidence is less clear when and how he actually received his complete disclosure booklet. During a brief period, the company tried a different approach of allowing traders to fax risk disclosures, but this practice was quickly suspended. Before then and subsequently, a single group of individuals, including Kathy Dempsey and Erica Bogardus, was responsible for mailing new account packets, with the risk disclosure booklet, to clients prior to their opening accounts. The CFTC offered evidence that Bingham was faxed a partial form and never received by mail the original, entire package before trading commenced.

16. The evidence established conclusively, however, that Bingham signed an acknowledgment that he received the booklet on March 5, 1998. His trading commenced on March 6, 1998. In opening his account and allowing trading, RJFCO, RJFCO's principal and Iowa Grain reasonably relied on Mr. Bingham's representation. Further, Bingham acknowledged at trial that risk of loss was disclosed to him and that he was never guaranteed profit in connection with his trades and was never told to disregard the risk disclosures.

17. Prior to the opening of any account, Raymond Fitzgerald reviewed and approved the account opening documents. In addition, all completed account opening forms were reviewed by Iowa Grain Compliance officers. No account could be opened or was opened without the prior approval of Iowa Grain.

18. It was not the firm's practice to make material misrepresentations to clients, in connection with the offer to enter into, the entry into, or the maintenance of any commodities transaction. The firm affirmatively discouraged employees from doing so and had ample procedures in place to enforce compliance.

19. While there may have been an aberrant occasion where an overzealous trader may have made marginally, misleading representations, these occasions were rare and certainly not proven to have been part of any knowing disregard for policy by the firm or its officers.

20. Consistent with the firm's advertisement that it was a full service introducing brokerage house, it had a research and analysis component, offered a varied range of investment services and offered individual trade recommendations. As such, this representation was not false.

21. It was not proven that the firm's win/loss record was any worse than that experienced by other firms in the industry. In fact, the only evidence adduced at trial established that the firm's success rate was consistent with or higher than that achieved industry-wide. Further, there was no evidence that the firm claimed that it had a superior win/loss record.

22. In fact, trading in commodities markets is inherently risky. One essentially bets on price fluctuations in markets which are driven by inherently unpredictable factors such as weather, politics, consumer consumption and future price movement predictions based on historical performance. The majority of people who trade in futures and options in commodities markets lose money. As a result, an individual's risk tolerance has to a certain extent already been demonstrated by their very choosing to enter into this very risky market. All the clients who traded with RJFCO expressly acknowledged by their signatures that they understood the level of risk involved. Every single page of the account opening package contained further disclosures and warnings about the high risk inherent in commodities trading. The CFTC offered evidence that RJFCO did not generate customer profits. Even if true, no such obligation existed to assess risk tolerance of each customer before making trade recommendations where, here, no discretionary account is in dispute and, thus, each customer approved each and every trade before such trades were placed. Additionally, the customers were expressly advised that only risk capital should be invested in this market. Further, RJFCO did not engage in "cold calling" in the traditional sense. Its customer base consisted largely of persons who had themselves first inquired into commodity trading.

23. As the controlling person in the firm, Raymond Fitzgerald instituted and maintained a reasonably efficient system of internal supervision and control. Further, the system was enforced with reasonable diligence. There was no evidence that Raymond Fitzgerald was aware of any violations and recklessly or intentionally failed to remedy any violations.

24. The firm and its officers were diligent in monitoring the brokers, both on the sales and trading side of the business. During the relevant period, Greg Burnett, Chuck Kowalski and Raymond Fitzgerald openly supervised the brokers' telephone calls, but also, without prior notice to brokers as to particular calls, listened to their solicitations of customers on a phone monitoring device.

### CFTC'S WITNESS TESTIMONY

25. The CFTC's core case consisted of relatively little direct evidence through customers. RJFCO had over 1200 customers during the relevant period. Yet, evidence of only seven alleged incidents of customer fraud was offered from which to establish the pattern or practice of fraud. The testimony was not compelling in quantity or quality.

26. At trial, the Court heard the testimony of Robert Bingham, a RJFCO customer during March 1998. The Court finds Mr. Bingham's testimony not fully credible. Mr. Bingham testified that he did not know anything about investing in commodities or the risks involved and that he told his trader, Al Coringrato, that he wanted a safe investment as he was risk averse. On the other hand, Mr. Bingham testified that he was a gambler, who frequented casinos 20–25 times per year, with a tax writeoff in gambling losses of at least $27,000 in the year in which he traded with RJFCO. He also testified that he had maintained several stock and mutual fund investments for at least six years with another brokerage firm. Additionally, while Mr. Bingham testified that he knows he did not receive the body of "booklet 2" because he was in the habit of saving everything he received related to his investments, he testi-

fied that he threw away the monthly statements from Iowa Grain which showed a loss of $25,000.

27. The Court similarly does not find the testimony of Diane Banks–Pazzanese to be fully credible. She attempted to represent that the funds she used in her investment with RJFCO were from her last reserve of savings. Upon further examination, Ms. Banks–Pazzanese was revealed to be a successful businesswoman who owned the building in which her hair salon was located, owned her own home, and reported to RJFCO she had a net worth of approximately a quarter of a million dollars. She acknowledged that she understood there was a risk of loss and she certified by signature that she received booklet 2. The Court accepts that sales practices, especially as it pertains to Ms. Banks–Pazzanese, may have involved pressure by the trader, Fred Fykes, that may have gone beyond industry standards, but this was not a claim asserted by the CFTC. Nor was it proven that RJFCO or the named Defendants were aware of this sales solicitation. Further, Ms. Banks–Pazzanese initiated contact with RJFCO in the first instance.

28. The Court does not find the testimony of Robert Friedman to be credible. Mr. Friedman testified that his trader did not explain what a synthetic futures trade was. However, in notes which he acknowledged were in his own handwriting, he wrote precisely what trades were recommended to him and noted also that synthetic futures would expose him to "unlimited downsize risk". At trial, without prompting, he corrected this statement in his notes to "unlimited downside risk" and explained that he understood this to mean he could lose

more than his initial investment. His assertion that he was confused and did not appreciate the risk of loss was further damaged by his testimony, on cross-examination, that he had previously lost $150,000 in a previous stock options transaction in which, but for negotiations with the broker, he would have lost substantially more than his investment.

29. Linda Ralston admitted that she received booklet 2 with the new account packet. Despite clear warning in the literature against it, she opened her account with borrowed funds. She approved all the transactions as well as the commissions earned by RJFCO.

30. Paul Patterson represented that he did not understand the risks involved in commodity futures and options trading. Yet, he traded stocks online for several years before opening his account with RJFCO. Additionally, he testified that he did not receive booklet 2, but the only evidence of this during his testimony was a computer transmittal document which did not contain the full copy of booklet 2. Mr. Patterson could not establish whether the printed document represented the complete file transmitted by RJFCO to him. In response to a demand from RJFCO counsel at trial, Mr. Patterson later submitted to the Court a hard copy of the portion of the RJFCO original application booklet after he testified that he had only ever received the computer generated materials. Finally, he, like the other customers, acknowledged in writing that he understood the risks of the trade he was entering.

31. Daniel Danaher, also a customer, maintained that he contacted RJFCO because he wanted to learn about commodities training. When he did receive the instructional packet, with charts, from RJFCO, however, he admits he spent only fifteen to twenty minutes looking at it and did not study the materials. Also, Danaher testified that he never authorized any of the trades executed on his account. On cross-examination, however, he admitted that there was actually only a single trade, and he did, indeed, authorize it.

32. The Court did not find the testimony of Scott Kelley, another customer, to be fully credible. His testimony that he received the business card, that evidence showed usually accompanied the RJFCO new account packet, but did not receive the packet with booklet 2, is suspect in itself. More unbelievable is his statement that he entered into this transaction without full disclosure in light of his other testimony that he waited for over a year, studying commodity futures and monitoring the corn market before entering his trades at RJFCO. He testified that he only entered the trades here after he confirmed the price movement that Mr. Kowalski, for RJFCO, was projecting. Further, his testimony that he did not understand his trades is undermined by the substantial experience he had in the commodities market in his work as vice-president of marketing at Kelley Foods, a multi-million dollar wholesale food distributor and meat processor. As part of his duties, he monitored commodity futures prices from the Chicago Board of Trade and followed futures prices on a daily basis when making large purchases of commodities for Kelley Foods.

33. The Court also finds the testimony of Robert Eubanks, a trader offered by the CFTC, was not fully credible. He testified at length on direct that

RJFCO officers discouraged him from teaching customers about the trades in their accounts and about the market in general. On cross-examination, however, he admitted that he had actually received several letters from customers thanking and complimenting him for spending substantial amounts of time teaching them and discussing their trades. In a sworn statement filed in opposition to an unrelated reparation action, Eubanks stated under oath that "I can produce numerous letters from clients stating that I'm one of the most patient, informed brokers they have ever had and that I was always willing to go the extra mile to explain things." Eubanks also testified that he never made misrepresentations to customers and never failed to disclose risk or to educate customers fully. Further, after testifying that the Series 3 Exam training he attended stressed the importance of disclosing risk to customers, as did Leiza Fitzgerald's training sessions, Eubanks stated that when he became a trader he did not know he was supposed to, as a matter of law, disclose all risk to clients. Eubanks' demeanor at trial and his inconsistent testimony on these very important matters rendered his entire testimony of limited assistance to the Court.

34. The Court similarly finds the testimony of Dale Skinner, another trader, not fully credible. Skinner testified that he was discouraged from talking to clients about their accounts and the market. Conversely, he testified that each of the four traders rotated late evening shifts during which they took calls from customers calling about their accounts and other questions. He also testified that he called customers and talked to them about their positions and the market. Sig-

nificantly, he consulted with counsel for four continuous hours prior to testifying at trial.

35. Victor Shelton testified that he told every customer that they had to read booklet 2 and directed them to sign their acknowledgment that they received and read it. He also testified that he never saw a profitable trade. In support of its summary judgment motion, the Government promised to offer the testimony of Mr. Shelton to support the contention that the Defendants had made admissions that RJFCO's trade recommendations were based solely upon a desire to generate commission without regard to the customers' best interest. Mr. Shelton's testimony was not consistent with the promises made and was of limited assistance to the Court. In any event, his tenure with the company was only 16 weeks long.

### DEFENDANTS' WITNESS TESTIMONY

36. Conversely, the testimony of Greg Burnett was credible. The CFTC attempted to impeach Mr. Burnett's credibility generally by questioning him regarding a previous substance abuse problem. Mr. Burnett's testimony, in response, was straightforward and frank, and he testified honestly that he had a substance abuse problem from 1997 through the first quarter of 1998. In February 1998, he took a leave of absence from RJFCO and voluntarily, with the aid of Mr. Fitzgerald, entered a rehabilitation facility and returned to RJFCO in March 1998. The Court does not find that his performance at RJFCO was significantly impacted by his substance abuse. The CFTC also introduced evidence that Burnett had been

named as a Defendant in an arbitration while at Olde Financial. Upon further questioning, it was revealed that Burnett had been released from the suit and that he had made full disclosure of the legal actions against him to the CFTC in his licensing applications. Further, the Plaintiff in the Olde Financial lawsuit apparently had subsequently been convicted on federal charges and incarcerated. Finally, the CFTC attempted to establish that Mr. Burnett had a number of financial problems—including an IRS debt, child support obligations and alimony obligations—which the CFTC argued would establish motive for him to commit fraud at RJFCO. The CFTC's questions and contentions had no basis in fact. Burnett testified that the IRS debt of $17,000, occasioned by his late payment of quarterly withholdings, had been fully paid by 1996 well before he came to RJFCO, and that he had no children and no alimony obligations.

37. Similarly, Chuck Kowalski's testimony was credible. His demeanor throughout direct and cross remained straightforward, honest and frank. His testimony regarding the firm's operation was extremely informed, precise and consistent with the evidence.

38. Leiza Fitzgerald testified credibly regarding her numerous leaves of absence from the firm during the relevant period due to complications with her pregnancy, illness and an accident. During the limited time when she was active at the firm, she was primarily responsible for conducting the sales training for the new brokers. In so doing, she taught them to utilize various solicitation devices that she had been taught. For instance, she taught brokers to employ the "Give, Get, Sell" technique whereby they were taught to "give" the customer a piece of relevant information about the market to arouse their interest, "get" information from the prospective client about themselves and their interest in trading, and then "sell" the customer on opening an account. Another closing technique was "Agree, Disarm, Comeback," pursuant to which sales brokers were trained to diffuse customer objections to sales pitches. The evidence at trial revealed these to be standard sales technique in the industry and they were utilized by RJFCO consistent with the industry and not as a tool to mislead prospective clients. Mrs. Fitzgerald testified credibly that a cornerstone of her training was to admonish sales brokers to disclose the substantial risk associated with options trading. In connection with her various sales trainings, Leiza Fitzgerald did not intend to cheat, defraud or mislead clients or prospective clients.

39. Raymond Fitzgerald testified credibly at trial that he reviewed all the account opening statements and relied on the acknowledgments of the customers that they had received, read and understood all the risk disclosures which accompanied the statements. Further, with regards to promotional materials, he submitted them to Iowa Grain for compliance review and also relied on the review of the materials conducted by Anne Farris, Iowa Grain's compliance officer. Mr. Fitzgerald's testimony that he attempted to create an environment where compliance was paramount and risk disclosure was considered critical was credible.

40. Raymond Fitzgerald sent two brokers, Scott Campbell and Tom West, to give sales seminars on commodities trading. Neither Mr. Fitzgerald, nor

anyone else with supervisory authority, attended the sales seminars. Prior to sending the brokers to make the presentations, however, Mr. Fitzgerald reviewed all the materials for the seminars and had the brokers do practice runs of their planned presentations.

41. Raymond Fitzgerald participated in developing the synthetic futures trade at the center of this enforcement action. He testified that he approved this trade recommendation, but instructed brokers to explain it to clients and obtain their prior approval before entering the trades. Mr. Fitzgerald conceded that he knew the trade was risky, but that it was a calculated risk with the potential for high returns. One of the brokers testified that he overheard Mr. Fitzgerald making a bet against the price of corn rising. Mr. Fitzgerald admitted at trial that he did make a bet with Mr. Kowalski, but that the bet was on how high the price of corn would rise. Both prices wagered by Fitzgerald and Kowalski were high enough to reap the type of return on client investments that the firm anticipated when they implemented the synthetic futures strategy. The Court finds that Raymond Fitzgerald was not motivated solely by commissions in recommending the synthetic futures trade, but genuinely anticipated the strategy would manifest a high return for client accounts. Mr. Fitzgerald testified credibly that it was not his intent nor his company's to cheat, defraud or deceive his or RJFCO's customers.

### THE FACTORS PRECIPITATING SUIT

42. In the spring of 1998, however, a confluence of factors placed RJFCO in the regulatory spotlight. The firm recommended to its clients this high risk trade strategy known as a synthetic future.

43. A long synthetic futures position seeks to exploit anticipated price movements in the market vis-a-vis the particular commodity being traded by using both puts and calls in a combined trade strategy. On one hand, the trade consists of a long call option—that is the future right to buy an option at a predetermined price. The buyer essentially bets that the predetermined price will be lower than the actual market price before the contract expires. The trader will, in that instance, exercise the option and reap the benefits of the "bargain" price. Simultaneously, the trader sells to another the future right in that other person to force a sale to the trader of a contract at a predetermined price, which the seller bets will be lower than the market at the time the contract matures, because the seller believes prices will rise. Obviously, if the seller's predictions are realized, the buyer will not exercise the option and the contract will expire worthless. In that event, the seller will keep the consideration paid as the profit on the transaction. Thus the trader has achieved a win/win on both sides of this transaction.

44. If prices fall, however, the seller loses on both sides as well. On the long call, the seller loses the initial investment plus commissions because he will not exercise the option; but that is the limit of potential loss. On the short put the consequences can be more dire. On that side of the transaction, if prices fall, the trader is obligated to buy the contract from the initial buyer and at a price higher than the original consideration received. The difference in the consideration received in the initial sale and

the price of the commodities contract in the market, whatever that difference may be, is called margin. That margin must be paid by the initial trader (the RJFCO customer) on demand to cover the loss—that is to permit the clearinghouse to purchase the contract and consummate the previously agreed upon contract for sale. Therein lies the unlimited exposure of risk in selling put options. It is this exposure that lies at the heart of this dispute, though, ironically, no customer suffered loss beyond his or her initial investment because RJFCO sold these contracts at a loss of initial investment before the price fluctuation subjected RJFCO customers to meet margin calls.

45. The trading strategy was bullish on corn[3] and required for its success a significant and dramatic rise in the price of corn futures in the contract period. Kowalski developed this strategy based on research suggesting that corn prices would rise due to certain predicted market forces, including the El Nino weather phenomenon, resulting drought conditions, decreased acreage of corn being planted, and heightened demand for corn. The decision, though risky, was based on deliberate research and logical assumptions and the strategy was developed primarily to yield profit for RJFCO clients, not simply to generate commissions.

46. Typically, the firm never previously recommended selling options, so this synthetic futures strategy also constituted a departure from the firm's investment philosophy. Before the strategy was implemented, the firm's clients were contacted and informed of the precise nature of the trade, and RJFCO disclosed that the move to selling puts exposed them to virtually unlimited risks of loss. Some customers declined and those customers were not placed in the synthetic futures position.

47. In making the predictions about the price of corn and developing the synthetic futures strategy, which was supposed to be the vehicle by which the price increase was to be exploited, Kowalski studied numerous reports from various sources including: the Hightower Report, Smith Barney, Prudential Securities, Stewart Peterson, Freese–Notis. He also researched the weather through the following sources: Freese–Notis, Weather.com, Iowa Grain meteorology reports, and Crop Cast.

48. Kowalski predicted that weather problems would start to be factored into the corn prices in December of 1998, when the new crops are harvested.

49. Kowalski deliberately chose a synthetic futures strategy rather than a straight futures position even though the straight futures contract could achieve the same effective position in the market but with half the number of trades. Kowalsk, reasoned that the volatility of the market during that period increased the likelihood that customers in a futures position, which bore a more direct relationship to price movement in the underlying commodity, would quickly reach their stop loss position[4] and be knocked

---

3. Bullish refers to an expectation of an increase in price or volatility.

4. A stop-loss order is a standing order designed to close out a losing position and thus limit potential loss when the price of the commodity reaches a level specified in the order.

out of the position or be exposed to losses exceeding their investments.

50. Because the synthetic futures strategy required twice as many contracts to be placed in a customer's account, it generated twice the commission, a fact on which the CFTC relied heavily in establishing motive to defraud. Specifically, the CFTC's expert, Peter Locke opined that the two-pronged structure of the synthetic future, coupled with the commissions, doubled by the simultaneous combination of long cal. and short put options, rendered the scheme incapable of delivering a profit for customers regardless of whether corn prices increased or not. Based on this opinion, CFTC alleges that RJFCO implemented the synthetic futures strategy only to generate commissions. The Court disagrees. In connection with the synthetic future strategy, RJFCO recommended the selling of puts in part to generate funds for the client accounts to provide some margin in the likely event of market volatility. Further, the funds generated on the sale of the options generated enough money to pay for or substantially offset the RJFCO commissions on one side of the transaction. Finally, the Court finds that the strategy was implemented to generate profits for customers, and it could have done so had the price of corn risen as expected.

51. As part of its marketing strategy for corn trades, for two weeks in the beginning of March 1998, the firm aired a promotional advertisement on CNBC, in which it represented that the EL Nino weather phenomenon could produce huge profits in the grain markets. The prediction of El Nino's potential impact of grain prices was based on extensive study by RJFCO's researcher and analyst, Kowalski, and partially informed by various meteorological reports and sources, as well as reports from other commodities analysts. The commercial was not deceptive or misleading. When the advertisement firm submitted the advertisement to Mr. Fitzgerald, he edited it and included additional risk disclosures. RJFCO sought and obtained pre-approval of the text of the advertisement by Iowa Grain's Compliance Director. After the advertisement had aired a few times during a brief period, Mr. Fitzgerald pulled the ad from the air. Shortly thereafter, NFA compliance officer, David Crooms, expressed some concerns to Raymond Fitzgerald about the statements in the commercial. Whereupon, Mr. Fitzgerald assured him that he did not plan to air it again. Based on these facts, even if the commercial could be interpreted as misleading *post hoc,* the Court finds that there was no intent to mislead or deceive customers through the airing of this advertisement.

52. Contrary to the firm's predictions to customers and on the air, corn prices plummeted in the crucial time frame. To limit the inevitable losses when the price approached the pre-designated support level [5], the firm contacted the clients to inform them of the declining position. RJFCO recommended closing the positions as the risk of closing with a negative

**5.** The support is that price level where new buying is likely to stem any future decline. Kowalski determined this price point by consideration of past market movements. This type of technical analysis is widely accepted as one reasonable predictor of future market movement.

balance was getting too high. All customers accepted this recommendation and their positions were sold. As a result, none of the customers sustained losses above their investment associated with the synthetic futures recommendation. Virtually all customers placed in bullish positions in corn, including those in synthetic futures, lost all or substantially all of their investments.

53. Simultaneously, or as a result, several brokers and traders defected from RJFCO and sought to violate their non-compete agreements and solicit the firm's clients. Those losing customers and several traders lodged complaints against RJFCO, prompting the investigation that led to the instant enforcement action.

54. Given that the firm's clientele was comprised primarily of individuals who were relatively inexperienced in commodities trading of any type, this transaction was too complicated and risky and should never have been recommended. Merely recommending a misguided trading strategy is not *per se* actionable, however. As set forth below the Undersigned finds that the CFTC failed to prove that RJFCO or individual defendants intended to cheat or defraud customers associated with this trading recommendation.

### CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter of this action and the parties which is based on federal question. See 28 U.S.C. § 1331.

In this lawsuit the CFTC has alleged that the Defendants or some individual Defendant have violated the Commodity Exchange Act ("CEA") and Commission Regulations by (1) committing fraud by misrepresentation or omission of material facts in connection with the solicitation, maintenance, or execution of commodity futures transactions, (2) operating an introducing brokerage firm to cheat, defraud, deceive, or to attempt to cheat, defraud or deceive clients, (3) trading client accounts to generate commissions without regard for clients' interests, (4) failing to provide adequate risk disclosure statements prior to the opening or causing the opening of a commodities trading account, (5) failing to supervise diligently, all in violation of 7 U.S.C. § 6c(b), 17 C.F.R. § 33.10(a) and (c), 17 C.F.R. § 166.3, and 7 U.S.C. § 13c(b).

### DISCUSSION

Counts One, Two, Seven, and Nine charge Raymond Fitzgerald, as principal; RJFCO, the firm; Leiza Fitzgerald and Greg Burnett with committing fraud by misrepresentation or omission of material facts in connection with the solicitation of commodity futures transactions.

Count Three, Ten, and Fifteen charge Raymond Fitzgerald, as principal; RJFCO; Greg Burnett; and Chuck Kowalski with operating an introducing brokerage to cheat defraud, deceive, or attempt to cheat, defraud or deceive clients.

Counts Four and Eleven charge Raymond Fitzgerald, RJFCO, and Greg Burnett with committing fraud by trading client accounts to generate commissions without regard for clients' interests.

Count Five charges Raymond Fitzgerald and RJFCO with failing to provide adequate risk disclosure statements prior to opening customer accounts.

Counts Six, Eight and Twelve charge Raymond Fitzgerald, Leiza Fitzgerald and Greg Burnett with failing to supervise diligently the sales practices and solicitations of RJFCO brokers.

### Scienter

■ An essential element of any charge of fraud under the Commodity Exchange Act is that the allegedly fraudulent conduct be committed with scienter—or intent. Thus, scienter is a required element under the anti-fraud provision of the CEA. *See Wasnick v. Refco,* 911 F.2d 345, 348 (9th Cir.1990). The Commission must show that the defendant intentionally violated the Act or acted with careless disregard of whether his actions violated the Act. *See CFTC v. Noble,* 67 F.3d 766, 774 (9th Cir.1995). Allegations of negligence, mistake or inadvertence do not satisfy scienter under the Act. *See Damato v. Hermanson,* 153 F.3d 464, 467 (7th Cir. 1998). In the present case, proof of scienter is a required element of Counts One, Two, Three, Four, Seven, Nine, Ten, Eleven and Fifteen.

Specifically, Counts One, Two, Seven, and Nine charge Defendants with committing fraud by misrepresentation or omission of material facts in connection with the solicitation of commodity futures transactions in violation of Section 4B(a)(i), (iii) and Section 4c(b) of the CEA and Commission Regulation 33.10, codified as 17 C.F.R. § 33.10(a) and (c).

Under those regulations it is unlawful for any person directly or indirectly to cheat, defraud or deceive or attempt to cheat, defraud or deceive any other person by any means in connection with an offer to enter into, the entry into, the confirmation of, the execution of, or the maintenance of, any commodity option transaction.

The CFTC alleges that the Defendants committed fraud by 1) using a television commercial which misrepresented the impact of the EL Nino weather phenomenon on commodity price movement; 2) instructing brokers to mislead customers in their phone solicitations, especially as it relates to the firm's trading record, likeli-hood of profits and the nature of the risk involved; 3) using deceptive profit illustrations in promotional seminars.

*Fraudulent Solicitations*

■ CFTC alleges that RJFCO and Raymond Fitzgerald are liable for fraud in connection with the airing of a commercial which linked changes in commodity prices to the El Nino weather phenomenon. With regard to scienter, prior to airing the commercial Mr. Fitzgerald edited it to include additional disclaimers and disclosures. He also shortened the advertisement. Further, he submitted the advertisement to Iowa Grain's compliance officer, and the script was approved by Anne Farris. Upon being informed that the NFA had concerns about the commercial's content, however, Mr. Fitzgerald told the NFA that he would not air the advertisement again. As such, the Court finds no intent to defraud as it relates to the airing of the El Nino commercial. In any event, the Court finds that the commercial was not misleading or deceptive.

As part of its fraud allegation, CFTC also alleges that Defendants instructed brokers to make misrepresentation and material omissions in their solicitations with customers. The evidence did not support this allegation. All the brokers who testified, both for CFTC and for the Defendants, stated that they were repeatedly instructed to tell the truth and not to guarantee profits. Further, each broker testified that he never made any misrepresentations in his solicitations to customers. As such, the Court does not find that the RJFCO principals instructed brokers and traders to make misrepresentations or intended to otherwise mislead or deceive clients and does not find that any broker ever made actionable misrepresentations to customers.

■ Next, the CFTC's claim that brokers committed fraud by failing to disclose

the firm's trading record is without merit. In *Thompson v. Smith Barney*, 709 F.2d 1413 (11th Cir.1983) the Court held that a broker owes a duty of full and fair disclosure to an investor and in order to sustain a cause of action, the investor must establish (1) the scienter of the defendant, (2) the materiality of any misrepresentation or omissions by the defendant (3) the extent of actual reliance by the plaintiff on the defendant's statements and (4) the justifiability of the reliance.

In the present case, the investors and the respective brokers to whom they spoke clearly maintained a fiduciary relationship which involved a duty to disclose. In keeping with this duty, the firm's practice was to send out risk disclosure booklets and incorporate the practice of disclosing risk in all their solicitations to clients. Further, a large portion of the firm's training sessions was devoted to ensuring that its brokers and traders fully understood and complied with the firm's policy of full disclosure. With this, the Court finds that the Defendants fully discharged their duty of disclosure and, under these facts, were not under any additional duty to disclose the firm's trading record.

In any event, CFTC failed to prove that the trading record of RJFCO was substantially different from that of other similarly situated firms, or that brokers ever represented to clients that the firm had a superior trading record, giving rise to any duty to disclose. Under these circumstances, the Court does not find that RJFCO was under a duty to disclose the firm's track record or that there was any intent to deceive or defraud in association with omissions relating to the matter.

■ Lastly, as it pertains to intent to defraud in reference to the profit illustrations the firm utilized in its promotional seminars, the Court considers that RJFCO's practice of having the scripts and illustrations approved by Iowa Grain's compliance officer. In addition, the Court does not find that there was anything patently or latently misleading or deceitful about the profit illustrations. Defendants established that such illustrations are used even in NFA manuals submitted to brokers for their consideration. While the promotional seminars did suggest that an investor could see a very high return on investments, there was also ample disclosure regarding the high risks involved. The Court agrees that more diligent supervision of actual presenters at the seminars could have been employed. Mr. Fitzgerald testified that practice runs of the presentations were conducted prior to allowing presenters to address potential clients, but that neither he nor anyone with supervisory authority attended the presentations in a supervisory capacity. In any event, such failure, even if negligent, is insufficient to establish fraudulent intent. In fact, the only customer who testified that she was solicited via a seminar acknowledged that risk of loss was described to her.

Finally, the CFTC claims that the mere attempt to deceive, defraud or cheat is actionable, even absent any proof of actual fraudulent conduct. The CFTC argues, therefore, that the Defendants' alleged acts of instructing traders and brokers to make misrepresentations to customers violated the CEA's prohibitions against attempted fraud, even though there is no evidence that any misrepresentations were actually made.

■ It is a violation of the CEA to attempt to defraud or cheat any person in connection with an offer to enter into, confirmation of, execution of, or the maintenance of any commodity futures transaction. 17 C.F.R. § 33.10. As in other aspects of the law, a *prima facie* showing of attempt to cheat or defraud requires evidence of some overt act or substantial

step in the commission or preparation to commit the violation. That overt act must be sufficient to demonstrate the intent of the Defendant to cheat or defraud a person in connection with a commodity option transaction.

By way of analogy, it is well-established in the criminal law context that a conviction for the crime of attempt requires, first, that the defendant must have been acting with "the kind of culpability otherwise required for the commission of the crime which he is charged with attempting" and second, that "the defendant must have engaged in conduct which constitutes a substantial step toward the commission of the crime." *United States v. Forbrich*, 758 F.2d 555, 556 (11th Cir.1985). The 'substantial step' must be conduct that is strongly corroborative of the firmness of the defendant's criminal intent. *Id.* at 556.

Thus, even an attempt to deceive, defraud or cheat customers in connection with a commodities transaction requires at least the same showing of scienter. The Court does not find scienter and, therefore, does not find any liability for attempted fraud under the CEA.

*The Synthetic Futures Trade Recommendation*

■ The CFTC also alleges that the firm and individual Defendants traded in the clients' accounts for the primary purpose of generating commissions without regard to clients' interests. Specifically, the CFTC alleges that the synthetic future trade was recommended with no reasonable basis in fact and was only recommended to generate commissions—which were doubled because of the multi-faceted nature of the trade strategy.

Upon consideration, the Court finds that RJFCO and the individual Defendants recommended this trade to clients only after extensive study of numerous reports from various sources. These reports substantially bolstered their belief that the price of corn was due to rise dramatically. Kowalski also analyzed numerous meteorology reports which supported his prediction that weather problems associated with the El Nino weather pattern would start to be factored into the corn prices in December of 1998. It was based on this analysis and these forecasts that the Defendants sought to take full advantage of the market movement by implementing this risky trade strategy—a strategy which essentially seeks to benefit twice from the same commodity price movement. As such, the Court finds that though, in hindsight, the trade strategy was too risky for the firm's clientele, it was recommended based on reasonable analysis of market events and not for the primary purpose of generating commissions. Further, Raymond Fitzgerald instructed the traders to explain fully to the clients the trade strategy, and all clients who were put into the trade gave their consent beforehand. The Court does not find any intent by any of the Defendants to defraud or cheat customers in association with the recommendation of the synthetic futures trade strategy.

Based on the foregoing, the Court finds that there was no intent on the part of the Defendants to cheat, defraud or deceive or attempt to cheat, defraud or deceive any person in connection with the offer to enter into, the entry into, the confirmation of, the execution of, or the maintenance of, any commodity option transaction. The Court, therefore, finds for the Defendants as it relates to Counts One, Two, Three, Four, Seven, Nine, Ten, Eleven and Fifteen.

### Controlling Person Liability

A central feature of the CFTC's claims against Raymond Fitzgerald involves his role as the controlling person in the firm, having direct control over the persons accused of the underlying violations.

Controlling person liability is created pursuant to 7 U.S.C. § 13c(b) which provides:

"Any person who, directly or indirectly, controls any person who has violated any provision in this chapter may be held liable for such violations in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation."

7 U.S.C. § 13c(b).

 "A controlling person acts in bad faith if he did not maintain a reasonably adequate system of internal supervision and control over the employee or did not enforce with any reasonable diligence such system." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir.1993). The controlling person must also act recklessly; negligence alone is insufficient. *Id.*

 The weight of the evidence in the present case supports a finding that Raymond Fitzgerald did maintain a reasonably adequate system of supervision and it was enforced with reasonable diligence. Fitzgerald instituted a system of supervision which involved several different components. During the relevant period, the brokers were directly supervised by Greg Burnett, either by direct, proximal observation or by a phone monitoring device. Fitzgerald also walked the floor and monitored phone conversations. In addition, Raymond Fitzgerald directly reviewed every new account packet for compliance before accounts were opened, reviewed and approved all trades before they were placed, and he hired competent and experienced supervisors. Greg Burnett, for instance, had significant prior experience supervising a branch office and eventually managing seven branch offices. All promotional materials were audited by Anne

Farris of Iowa Grain. RJFCO, at Mr. Fitzgerald's insistence, also required all brokers and traders to read and keep its compliance manual. As a result of all the safeguards, RJFCO's internal and external audits were satisfactory.

In addition, the CFTC's claim as it pertains to this provision suffers from two critical deficiencies. First, the Commission failed to prove that Raymond Fitzgerald was aware of any CEA violations and, in bad faith, failed to act. Second, the CFTC did not prove any underlying violation of the CEA by RJFCO employees. As it pertains to the latter, this deficiency also undermines the CFTC's claims against all the individual Defendants for aiding and abetting. Without proof of an underlying violation, the Court cannot find any liability for aiding and abetting in this case. As such, and based on the foregoing, the Court finds for the Defendants as to the CFTC's charges against Raymond Fitzgerald, as the § 13c(b) controlling person, and all the individual Defendants for aiding and abetting pursuant to § 13c(a).

### *Failure to Supervise*

The CFTC also alleges that RJFCO's officers failed to supervise employees and are therefore liable under 17 C.F.R. § 166.3, which provides:

"Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents . . . of all commodity interest accounts carried, operated, advised, or introduced by the registrant and all other activities of its partners, officers, employees and agents . . . relating to its business as a Commission registrant."

17 C.F.R. § 166.3.

The Court finds that Defendants put into place an adequate supervisory system

and that system was diligently administered. For that reason and the reasons discussed above, the Court finds for the Defendants as to Counts Six, Eight and Twelve.

### Duty to Disclose Risk

The CFTC additionally alleges that Defendants failed to make § 33.7 risk disclosures. 17 C.F.R. § 33.7 provides, in relevant part:

(a)(1) ... no futures commission merchant, or in the case of an introduced account no introducing broker, may open or cause the opening of a commodity option account for an option customer, ... unless the futures commission merchant or introducing broker first:

(i) Furnishes the option customer with separate written disclosure statement as set forth in this section or another statement approved under § 1.55(c) of this chapter and set forth in appendix A to § 1.55 which the Commission finds satisfies this requirement, or includes either such statement in a booklet containing the customer account agreement and other disclosure statements required Commission rules; ... and

(ii) .. receives from the option customer an acknowledgment signed and dated by the option customer that he received and understood the disclosure statement.

This allegation does not require a finding of scienter. The treatment of the risk disclosure requirement in the CEA is more akin to a strict liability standard, but certain presumptions exist in the law when a broker diligently seeks to ensure that customers have received disclosures and understand the risks associated with their investments.

 In this regard, once a customer signs and acknowledges that he or she received full disclosure of risk and understands same, a presumption of compliance with § 33.7 arises in favor of the broker.

That is, it is assumed that an adequate disclosure was made under the law. This presumption may be vitiated, however, by a showing that brokers made misrepresentations about risk to customers which undermine the importance of the risk disclosures initially given. *See Clayton v. Commodity Futures Trading Commission*, 794 F.2d 573 (11th Cir.1986).

 In the present case, CFTC alleges that customers did not receive the full risk disclosure booklets and that brokers did not otherwise properly disclose the nature of the risk inherent in commodities trading. While the customers initially testified they did not understand the risk, each acknowledged the risk by his or her signature on the risk disclosure forms and, each acknowledged receipt of the additional risk disclosure on virtually every page of the account opening documents he or she completed. There was some question as to whether the customer Robert Bingham actually received every page of his disclosure booklet. Bingham did acknowledge on the application and account opening documents that he received, read and understood the risk disclosure booklet. Also, there was no evidence that any broker attempted to minimize the risk of loss to Mr. Bingham or any other customer. *See e.g. CFTC v. Sidoti*, 178 F.3d 1132 (the effectiveness of the risk disclosure diluted by broker's description of the disclosures as mere formalities and encouragement to customers not to read them). Thus, the presumption of the validity of the signed acknowledgment stands as to Mr. Bingham.

Further, the Court finds the testimony of Kathy Dempsey to be credible and informative in this regard. Ms. Dempsey testified that the brokers were charged with soliciting new clients. Prior to the opening of any account or any trading, however, a single group of individuals, consisting of Ms. Dempsey and Erica Bor-

gardus, were responsible for mailing new account packets with the entire risk disclosure booklet. These individuals operated from a room to which brokers and traders did not have free access. Ms. Dempsey and Mr. Fitzgerald testified credibly that the purpose of denying brokers access was to ensure conformity of process and compliance. In addition, Mr. Fitzgerald personally reviewed every new account to ensure that all the disclosure forms had been sent to clients and the acknowledgments were signed. Finally, before a trade could be placed with Iowa Grain, the clearing house, Iowa Grain's own compliance officers also reviewed the new account forms for risk disclosure compliance.

Based on the foregoing, the Court finds that RJFCO and Defendants had a reasonable and efficient system in place to ensure consistent compliance with risk disclosure rules, and Defendants did provide risk disclosures as required under 17 C.F.R. § 33.7 to each customer prior to opening or causing to be opened any commodity option account. Accordingly, the Court finds for the Defendants as to Count Five.

### CONCLUSION

Based on the foregoing, the Clerk of Court is directed to enter judgment in favor of the Defendants RJFCO, Raymond Fitzgerald, Leiza Fitzgerald, Greg Burnett and Chuck Kowalski as to all Counts of the complaint. With that, all pending motions are denied as moot.