[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 29, 2002
THOMAS K. KAHN
CLERK

No. 01-14780

D.C. Docket No. 99-01558-CV-T-23F

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff-Appellant,

versus

R.J. FITZGERALD & CO., INC.,
RAYMOND FITZGERALD,
LEIZA FITZGERALD,
GREG BURNETT,
CHUCK KOWALSKI,

Defendants-Cross-
Claimants-Third-Party-
Plaintiffs-Appellees,

AL CORINGRATO,

Defendant-Cross-
Defendant,

SCOTT EUBANKS,
JOHN RODGERS, et al.,

Third-Party-Defendants.

Appeal from the United States District Court
for the Middle District of Florida
(October 29, 2002)

Before TJOFLAT, WILSON and COWEN*, Circuit Judges.

COWEN, Circuit Judge:

Presented in this appeal is the question of liability for fraud and related allegations under the Commodities Exchange Act, 7 U.S.C. §§ 1 *et seq.,* (the "CEA" or "Act") and accompanying regulations. Plaintiff/Appellant Commodities Futures Trading Commission ("CFTC") appeals from a judgment finding all Defendants not liable under the Act for various solicitation and trading activities carried out at R.J. Fitzgerald & Company, Inc. ("RJFCO"). After reviewing the record in this matter, considering the submissions of the parties, and having benefitted from oral argument, we conclude that the District Court erred in not finding liability under the Act as a matter of law for two specific solicitation devices utilized by RJFCO: (1) a television commercial that aired on the "CNBC" cable network in March 1998 (The "Commercial") and (2) a promotional seminar for potential RJFCO customers that also took place in 1998 (the "Seminar"). For

---

*Honorable Robert E. Cowen , U.S. Circuit Judge for the Third Circuit, sitting by designation.

the reasons expressed below, we will reverse as to Raymond Fitzgerald, Leiza Fitzgerald and RJFCO, and remand only for enforcement proceedings against those two individuals and the firm.

## I. Procedural Background

In 1999, CFTC commenced this CEA enforcement case by filing a Complaint against Defendants/Appellees RJFCO, Raymond Fitzgerald, Leiza Fitzgerald, Chuck Kowlaski, and Greg Burnett, alleging that they were involved in fraudulent solicitations to attract potential customers throughout the United States to invest in commodity options, in violation of the Act and related federal regulations.[1] This Complaint was dismissed essentially for failure to plead fraud with particularity.

The District Court then required CFTC to file an Amended Complaint detailing every fact it intended to prove in establishing liability under the ACT. CFTC complied with that request, filing an extensive 138 page, 15 count Complaint which sets the framework for the instant case. The Amended Complaint alleged that Defendants, or some individual Defendants, violated the Act by: (1) committing fraud by misrepresentation or omission of material facts in connection

---

[1] The Complaint also named as a Defendant RJFCO employee Al Coringrato who settled the claim before trial.

3

with the solicitation, maintenance, or execution of commodity futures transactions; (2) operating an introducing brokerage firm to cheat, defraud, deceive, or attempt to cheat, defraud or deceive clients; (3) trading client accounts excessively in order to generate commissions without regard to customer interests ("churning"); (4) failing to provide risk disclosure statements prior to the opening of RJFCO customer accounts; and (5) failing to supervise firm personnel diligently. Defendant Raymond Fitzgerald was charged with "controlling person" liability under the Act. The various allegations in the Amended Complaint encompass claims grounded in 7 U.S.C. § 6c(b), 17 C.F.R. § 33.10(a) and (c), 17 C.F.R. § 166.3, and 7 U.S.C. § 13c(b).

Counts one, two, seven and nine alleged that Raymond Fitzgerald, as principal of RJFCO, RJFCO, Leiza Fitzgerald and Greg Burnett committed fraud by misrepresentation or omission of material facts in connection with the solicitation of commodity futures transactions. Counts three, ten and fifteen charged Raymond Fitzgerald, as principal of RJFCO, RJFCO, Greg Burnett and Chuck Kowalski with operating an introducing brokerage to cheat, defraud, deceive, or attempt to cheat, defraud or deceive clients. Counts four and eleven charged Raymond Fitzgerald, RJFCO, and Greg Burnett with committing fraud by trading client accounts excessively to generate commissions without regard to

4

client interests. Count five charged Raymond Fitzgerald and RJFCO with failing to provide adequate risk disclosure statements prior to opening customer accounts. Counts six, eight, and twelve charged Raymond Fitzgerald, Leiza Fitzgerald and Greg Burnett with failing to supervise diligently the sales practices and solicitations of RJFCO brokers.

After some of the claims in the Amended Complaint were dismissed on summary judgment, the parties agreed, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, to conduct a bench trial before a Magistrate Judge[2]. That trial commenced on February 26, 2001. On March 8, 2001, the Court heard oral argument and granted what it labeled a "directed verdict" against a significant part of the CFTC's case. Germaine to this appeal, and as will be explained further below, the District Court granted relief to Defendants on that part of the CFTC's claim that the Commercial violated the Act as well as on the claim that Defendants had a duty to disclose their specific trading record (i.e., their success rate) to potential customers.

The trial pressed forward to completion on the remaining claims in the Amended Complaint and concluded on March 19, 2001. Thereafter, the District

---

[2]Trial before the Magistrate Judge will hereafter be referred to as the "District Court" or the "Court."

5

Court entered extensive findings of fact and conclusions of law, ruling in favor of all Defendants on all counts in the Amended Complaint. *See CFTC v. R.J. Fitzgerald & Co., Inc.*, 173 F. Supp.2d 1295 (M.D. Fla. 2001). CFTC appeals, essentially arguing that regardless of the Court's factual findings based on witness credibility, Defendants committed fraud and other CEA violations as a matter of law.

## II. Background Facts

### A. The Defendants

RJFCO was a full service "introducing broker" at all times relevant to this appeal. *See* 7 U.S.C. § 1a. RJFCO's obligations to those with whom it dealt were guaranteed by Iowa Grain Company ("Iowa Grain"), a registered futures commission merchant. RJFCO opened for business in 1992. It operated as a firm designed to service small customer accounts, where the customer base had little experience in commodities markets. RJFCO operated in a perhaps unique manner in the commodities industry in that it used one team of sales brokers for generating customers via telephone calls and a separate team of brokers and traders to do the actual trades and monitor accounts. Defendant Raymond Fitzgerald was the principal of RJFCO and was responsible for all decisions, actions, and trading recommendations made or entered into by the firm. Defendant Leiza Fitzgerald's

6

responsibilities at RJFCO involved developing training materials and training sales brokers. Greg Burnett was an associated person at RJFCO and was responsible for supervising traders and brokers. Chuck Kowalski was RJFCO's chief financial analyst, responsible for studying the commodities markets and developing trades and trade strategies.

### B. Customer Solicitation Devices

At the heart of this appeal are two solicitation devices used by RJFCO to attract customers to invest in options on futures contracts: the Commercial and the Seminar.

#### 1. The Commercial

The Commercial stated that "the El Nino [weather phenomenon] has struck where expected, and if patterns continue, the effects could be devastating. Droughts, floods, and other adverse conditions could drastically alter the supply and demand dynamics of the corn market . . . ." The Commercial also declared that "[w]ith the giant developing nations, such as China and Russia badly in need of grains and world grain supplies put to the test, conditions may exist for profits as high as 200 to 300 percent." This was accompanied by a graphic statement on the television screen that the percentages were a mathematical example of leverage.

The Commercial further asserted that "the potential of the corn market may never be greater. Tight U.S. reserves coupled with domestic and worldwide demands could be the formula for a trade you won't want to miss. Find out how as little as $5,000 could translate into profits as high as 200 to 300 percent. Call R.J. Fitzgerald today . . . ."

The Commercial was initially drafted by an advertising agency. When Raymond Fitzgerald first received the script, he edited it to add additional risk disclosures that would appear just above the firm's phone number, so that anyone watching the Commercial would see the risk disclosure. He further insisted that this disclosure appear more than half the time the Commercial was running. After his edits were done, he sent the script to Iowa Grain's chief compliance officer, Anne Farris. Iowa Grain approved the script on February 18, 1998.

The Commercial actually ran on CNBC for the first half of March, 1998, but did not generate much business. In total, it appeared about eight or nine times and was then discontinued. At some point after its discontinuation, Raymond Fitzgerald was contacted by a National Futures Association ("NFA")[3] compliance officer, who expressed concern over the Commercial's content. More specifically,

---

[3] The National Futures Association ("NFA") is a congressionally authorized futures industry self regulatory organization. The purpose of the NFA is to assure high standards of business conduct by its Members and to protect the public interest.

the NFA officer, David Croom, informed Raymond Fitzgerald that the Commercial was in apparent violation of NFA rules because: (1) it was misleading in that it failed to tell potential customers that the options spoken of were "out-of-the money options" that would require a dramatic move in the options premium value in order for the customer to see gains equal to that claimed in the Commercial; (2) misleadingly gave the impression that weather events were inevitable; (3) did not display the risk of loss statement prominently enough on the screen; and (4) downplayed the risk of loss. In response to this concern, Raymond Fitzgerald informed Croom that the Commercial had already been discontinued and would not be aired again.

At the close of CFTC's case, and before the defense was presented, the District Court entered a directed verdict in favor of Defendants on the part of the claim that the Commercial was fraudulent and violated the CEA. The District Court addressed the Commercial again in its opinion issued after the bench trial, stating that the Commercial was not "misleading or deceptive" and that there was no "intent to defraud." 173 F. Supp.2d at 1310.

### 2. RJFCO's 1998 Promotional Seminar

In addition to the Commercial, CFTC alleged CEA violations occurred in a promotional seminar used by RJFCO to attract customers. The Seminar was

developed by Leiza Fitzgerald and RJFCO brokers Scott Campbell and Tom West

after they attended a training session on the topic conducted by the National

Introducing Brokers Association.[4]

The Seminar informed customers that weather patterns, political events, and

historical trends can affect the prices of certain commodities. The Seminar also

told customers that technical analysis could assist them in the commodity options

market, since "history often repeats itself" and "past price action can provide you

with clues to future action." Customers were told they could "take advantage" of

"fundamental" market moves such as weather events and political events and

"technical theory" such as past market movements through either futures or options

investing. The Seminar also drew a distinction between investment instruments

based on the quantum of risk involved:

> Which one you choose depends on how aggressive or what
> degree of risk you wish to take on.
>
> If you are highly aggressive and looking for unlimited profit
> potential as well as unlimited risk than [sic] it would be the
> futures. But most would like something less aggressive,

---

[4] Leiza Fitzgerald developed the script of this Seminar based in part on materials from an NFA workbook and manuals from the Chicago Board of Trade. Testimony adduced at the bench trial revealed that RJFCO employees would read the promotional scripts given to them by Leiza Fitzgerald verbatim. The Seminar provided general background on the firm and how the commodities market operates. At the beginning of the Seminar, participants received written risk disclosure material. As with the Commercial, the content of the Seminar was approved by Iowa Grain before it went into action.

something offering unlimited profit potential but limited risk--option trade [sic].

On the topic of risk, the Seminar additionally told potential customers: "options on futures allow investors and risk mangers to define risk and limit it to the loss of a premium paid for the right to buy or sell a futures contract while still providing . . . unlimited profit potential."

The RJFCO employees who conducted the Seminar offered what the Seminar script deemed a "very exciting" illustration of how profits could be made on options. Specifically, the Seminar focused on the commodity heating oil, explaining that for the last eighteen years, there was an average increase in that commodity "of 22 cents from the low to the high in the price range" and that a $5,000 investment on a heating oil futures contract would result in $46,200 if there was a 22 cent move in the price. Customers were told that if they wanted "limited risk," they could invest in an option contract, where they would receive "approximately 50% of that profit–46,200 divided by 2 equals $23,100."[5]

In its opinion following the bench trial, the District Court concluded that the Seminar did not violate the CEA. The District Court explained that there was

---

[5] Finally, the Seminar had more general advice for potential RJFCO customers: a "big reason" people lose money is "greed" and that "you will never go broke taking a profit, just take it one piece at a time."

11

nothing "patently or latently misleading or deceitful" about the profit illustrations used in the seminar. 173 F. Supp.2d at 1311.

## III. Discussion

The District Court had jurisdiction over this case under 7 U.S.C. § 13a-1 and 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 636(c)(3) and 28 U.S.C. § 1291.

It is somewhat unclear from the briefing what specific parts of the judgment below are being challenged by CFTC, especially given the large number of allegations in the extremely lengthy Amended Complaint. CFTC's initial brief requests that this Court "reverse the district court's judgment and remand with instructions to enter judgment in favor of appellant CFTC *on the Amended Complaint*." Appellant's Brief at 57. However, we can construe the CFTC's appellate position from the briefing and from oral argument. It specifically challenges these discrete aspects of the District Court's judgment: (1) the Commercial did not violate the Act; (2) the Seminar did not violate the Act; (3) Defendants had no duty to disclose their trading record to potential customers; (4) Defendants did not excessively trade their customers' accounts without regard to customer interest; and (5) Raymond Fitzgerald did not have "controlling person" liability under the Act. As explained below, we agree that the District Court erred

12

in not finding liability as a matter of law under the Act for the Commercial, the Seminar, and for failure to disclose RJFCO's trading record in both. We further agree that Raymond Fitzgerald is liable in this case as a "controlling person" at the firm. We do not disturb the District Court's judgment as to the remaining alleged points of error.

A. The Commercial

CFTC argues that the District Court erred because the Commercial is fraudulent as a matter of law. Upon review of the full text of the Commercial, we are constrained to agree. The CEA and its accompanying regulations directly proscribe attempts to deceive and defraud in connection with futures and options trading. 17 C.F.R. § 33.10 provides:

> It shall be unlawful for any person directly or indirectly:
> (a) To cheat or defraud or attempt to cheat or defraud any other person;
> (c) To deceive or attempt to deceive any other person by any means whatsoever
> in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

*See also* 7 U.S.C. § 6b(a)(i), (iii) (proscribing similar conduct in connection with a futures contract).

In order to establish liability for fraud, CFTC had the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality. *See Hammond v. Smith Barney Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) 24,617 (CFTC Mar.1, 1990); *CFTC v. Trinity Finan. Group, Inc.*, Comm Fut. L. Rep. 27,179 (S.D. Fla. Sept. 29, 1997), *aff'd in relevant part*, *CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir. 1999). Failure to establish any one of these elements is dispositive and would preclude CFTC's fraud/deception claims.[6]

Whether a misrepresentation has been made depends on the "overall message" and the "common understanding of the information conveyed." *Hammond*, Comm. Fut. L. Rep. at 36,657 & n.12. For purposes of fraud or deceit in an enforcement action, scienter is established if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct represents an extreme departure from the standards of ordinary care. *See, e.g., Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 677-79 (11th Cir. 1988). In the similar context of federal securities law, we have previously stated that scienter is met when Defendant's conduct involves "highly unreasonable omissions or misrepresentations . . . that present a danger of

---

[6] Unlike a cause of action for fraud under the common law of Torts, "reliance" on the representations is not a requisite element in an enforcement action. *See, e.g., CFTC v. Rosenberg*, 85 F. Supp.2d 424, 446 (D.N.J. 2000).

14

misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). A representation or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54, 92 S. Ct. 1456, 1472 (1972); *R & W Technical Servs., Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000).

In applying these various elements to the present case, we are guided by the principle that the CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor–who may know little about the intricacies and complexities of the commodities market–from being misled or deceived. As the Fifth Circuit recently explained in *R & W*:

> In 1974, Congress gave the [CFTC] even greater enforcement powers, in part because of the fear that unscrupulous individuals were encouraging amateurs to trade in the commodities markets through fraudulent advertising. Remedial statutes are to be construed liberally, and in an era of increasing individual participation in commodities markets, the need for such protection has not lessened.

*Id.* at 173 (citations omitted) (emphasis added).

The parties obviously do not contest the textual content of the Commercial. The actual words of the Commercial and how the Commercial physically appeared

15

on television are undisputed matters of record and do not require us to second guess what the District Court concluded with regard to witness demeanor and credibility at the bench trial. That being said, we are persuaded that these undisputed facts demonstrate fraud and deception as a matter of law.

Read for its *overall message*, and how that message would be interpreted by an objectively reasonable television viewer, the Commercial overemphasizes profit potential and downplays risk of loss, presenting an unbalanced image of the two. The Commercial suggests to the potential investor, that truly enormous profits (200-300%) can be made on options on futures contracts by looking at known and expected weather patterns. More specifically, the Commercial affirmatively represents to potential RJFCO customers that El Nino had struck "where *expected*" and that if the "*patterns continue*," "*huge* profits" of *"200 to 300%"* could be realized. The Commercial also improperly overstated the profit potential by suggesting to potential customers that they should not pass up such a tremendous chance to make money. Rather, viewers are told to call RJFCO "now" because there may "never" be such an opportunity in the corn market again. ("The potential of the corn market may *never* be greater [and] "could be the formula for a trade *you won't want to miss*. Find out how as little as $5,000 could translate into profits as high as 200 to 300 percent. Call R.J. Fitzgerald today."). Against these

16

highly alluring statements is only boilerplate risk disclosure language. We agree with CFTC's position that these statements directly contravene the legal principles established in prior commodities fraud cases. *See, e.g., Trinity Finan. Group*, Comm. Fut. L. Rep. 27, 179, *aff'd in relevant part*, *Sidoti,* 178 F.3d 1132; *In re JCC, Inc.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,080 (CFTC May 12, 1994), *aff'd*, *JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995); *Bishop v. First Investors Group*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) 27,004, 44,841 (CFTC Mar. 26, 1997); *In re Staryk*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. 27,206, 45,809 (CFTC Dec. 18, 1997). As we have indicated in various prior commodities cases, the fact that the Commercial had a general risk disclosure statement does not automatically preclude liability under the CEA where the overall message is clearly and objectively misleading or deceptive. *See Clayton Brokerage Co. v. CFTC*, 794 F.2d 573, 580-81 (11th Cir. 1986); *JCC*, 63 F.3d at 1565 n.23, 1569-70; *Sidoti*, 178 F.3d at 1136 ("we seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial."); *see also Bishop*, Comm Fut. L. Rep. at 44,841. Contrary to Defendants' argument, we see no absolute, bright-line requirement in these cases that a solicitation offer a "clear guarantee[]" of profits before liability is triggered. Appellees' Brief at 40. Nor should there be. Such an exacting standard

17

would thrust the door of deception wide open, allowing clearly misleading statements to escape CFTC enforcement, thereby thwarting the underlying purpose of the Act. Brokers would have free reign to abuse their knowledge by subtly manipulating customer beliefs about the functioning of commodities markets, afforded safe haven so long as no actual "guarantee" is made.

Having determined that the Commercial contained deceptive and misleading statements, we next consider the element of scienter. This element is also met here as a matter of law. Defendant acted recklessly with regard to the statements aired on television. This recklessness is premised on the fact that this Court and the CFTC have previously condemned attempts to attract customers by: (1) linking profit expectations on commodities options to known and expected weather events, seasonal trends, and historical highs; (2) suggesting that the commodities market can be correctly timed to generate large profits; and (3) substantially inflating option profit expectations while downplaying risk of loss. We hold that Defendant, as a federally registered professional, knowledgeable in the nuances and complexities of the industry, deviated in an extreme manner from the standards of ordinary care.

The final element, materiality, is satisfied as well. It is too obvious for debate that a reasonable listener's choice-making process would be substantially

18

affected by emphatic statements on profit potential ("200-300%") and the suggestion that known and expected weather events are the vehicle for achieving those enormous profits. A reasonable investor would also be heavily influenced by the suggestion in the Commercial that, due to weather events, the present day offers an opportunity like no other to make money in the corn market. *See In re JCC*, Comm. Fut. L. Rep. at 41,576 n.23 ("When the language of a solicitation obscures the important distinction between the possibility of substantial profit and the probability that it will be earned, it is likely to be materially misleading to customers."). *See also CFTC v. Noble Wealth Data*, 90 F. Supp.2d 676, 686 (D. Md. 2000) (representations about profit potential and risk "*go to the heart of a customer's investment decision* and are therefore material as a matter of law"), *aff'd in part and vacated in part*, 278 F.3d 319 (4th Cir. 2000).

Defendants argue that scienter is lacking with regard to the Commercial because Raymond Fitzgerald edited the Commercial to include more disclosures, sought and received approval from Iowa Grain, and assured NFA official Croom that the Commercial had already been discontinued after Croom expressed concern over its misleading content. None of these arguments can overcome the CFTC's position that prior cases establish the illegality of the Commercial's content as a matter of law. Moreover, Defendants should not be able to escape liability under

19

the Act by simply claiming that a related private business entity (Iowa Grain) issued its stamp of approval. Iowa Grain does not determine with legal finality what constitutes deceptive solicitations under the CEA and its regulations.

Defendants further argue that CFTC has not established "clear error" in the District Court's finding that the Commercial was not "deceptive or misleading," asserting that CFTC cannot possibly leap the barrier of this highly deferential standard of review. We are not persuaded. It is too well-settled for dispute that findings of fact which flow directly from the observation of witnesses at trial cannot be reversed unless clearly erroneous. But that doctrine of appellate review is not implicated here. This is not a situation where we must defer to a trial court's conclusion of fact because that conclusion rests on the unique opportunity to personally scrutinize live testimony at trial and measure credibility word by word. Rather, the precise language in the Commercial is an undisputed part of the appellate record. The fraudulent and deceptive nature of that language is, as CFTC posits, established as a matter of law in precedent. The precise error at the district court level is definitively legal in nature: it is the failure to recognize that the outcome of CFTC's claim on the uncontested words in the Commercial is controlled by case law. *See generally Lincoln v. Board of Regents*, 697 F.2d 928,

939 (11th Cir. 1983) (if legal error taints fact finding process, *de novo* review may be used by appellate court).[7]

B. The Promotional Seminar

Much of the discussion above on the illegality of the Commercial applies to the Seminar as well. We hold that the Seminar is also fraudulent and deceptive as a matter of law. Like the Commercial, the Seminar, when viewed in its entirety, suggests to a reasonable listener that RJFCO has a reliable strategy in place for increasing profits and limiting losses.[8] Like the Commercial, it presents a distinctly unbalanced picture between the potential for profit and the potential for loss in options, inflating one while downplaying the other. The Seminar also impermissibly suggests that profits on options on futures contracts (the specific type of investment they were promoting) are proportionally related to the cash

---

[7] As part of their argument that the Commercial is not deceptive, Defendants assert that investors had, in the past, actually made profits as large as 200-300%. However, just because such profits are possible, or have happened to some degree in the past, does not mean that the Commercial's total message is not misleading. *See JCC*, 63 F.3d at 1568 n.34. Even literally true statements can be extremely and impermissibly deceptive when viewed in their overall context. *See, e.g., In re Staryk*, Comm. Fut. L. Rep. at 45,809.

[8] This Circuit has clearly explained previously that brokers must be extremely careful when making representations in the commodities market because the standard *pro forma* risk disclosures do not "warn the customer to disbelieve *representations that certain trading strategies can . . . overcome inherent market risks, or that certain commodities are less volatile.* Those *unfamiliar* with the workings of markets are unlikely to understand that *no broker can eliminate or diminish risk.*" *Clayton*, 794 F.2d at 580-81 (emphasis added). We note that RJFCO designed its business specifically to deal with smaller, less experienced customers. *See R.J. Fitzgerald*, 173 F. Supp.2d at 1297.

21

market.  *See CFTC v. Commonwealth Finan. Group, Inc.*, 874 F. Supp. 1345, 1352 (S.D. Fla. 1994), *vacated on other grounds*, Slip Op. No. 94-5182, 79 F.3d 1159 (11th Cir. 1996); *Bishop*, Comm. Fut. L. Rep. at 44,841 (deceptive to tell customer that one could earn $420 for every penny increase in heating oil); *In re JCC*, Comm. Fut. L. Rep. 26,080 (fraud to tell customer that every time sugar moves ten cents, you make $67,000); *Trinity Finan. Group*, Comm. Fut. L. Rep. 27,179 (deceptive to use cash prices to predict proportional profits on heating oil options).

Furthermore, as with the Commercial, the Seminar, in its heating oil mathematical illustration, misleads potential customers by suggesting that historical movements and known and expected seasonal patterns can be used reliably to predict profits on options.  The Seminar gave those in attendance a deceptive impression that known seasonal trends will lead to their quick success and that options provide a scenario of "limited risk."  In this regard, we are especially concerned with the Seminar's suggestion toward the end of the undisputed script that "greed" is a major reason people do not make money in commodities and that a customer "will *never go broke* taking a *profit*."  Despite the Seminar's use of risk disclosure material, the overall impression is that RJFCO is going to make customers money if they invest in options.  Such conduct simply

22

cannot survive under the Act, its underlying purpose, its regulations, and the interpretive case law.    As with the Commercial, the statements in the Seminar are clearly material because an objectively reasonable investor's decision-making process would be substantially affected by the Seminar's discussion on limited risk, cyclical heating oil-weather patterns, and examples and illustrations of large profits. Such representations, as a matter of law, alter the total mix of relevant information available to the potential commodity option investor. Scienter is also established on this record as a matter of law for the same reasons as with the Commercial. Precedent has condemned materially similar representations in the past, including specific representations on heating oil. We hold that Defendants acted with the requisite recklessness and departed in an extreme manner from the ordinary standards of care.

C.  Fraudulent Omission: Non-Disclosure of the Firm's Success Record

As explained above, CFTC contends, and we agree, that liability is established with regard to the language used in the Commercial and the Seminar. As an additional violation of the Act, CFTC claims that these two solicitation devices were fraudulent as a matter of law because they spoke of RJFCO's strategy for enormous profit potential without simultaneously informing potential RJFCO

23

customers that more than 95% of the firm's clientele lost money in the types of investments being advertised.[9] We agree.

Given the extremely rosy picture for profit potential painted in the Seminar and in the Commercial, a reasonable investor *surely* would want to know–before committing money to a broker–that 95% or more of RJFCO investors lost money. Such a disclosure would have gone a long way in balancing out, for example, the affirmative representation in the Commercial that the grain market was ripe for "huge" profits of "200-300 percent" and to telephone RJFCO "now" because such a corn market opportunity may "never" exist again. It would also have done much to counteract the assertion of "limited risk" in the Seminar. It is misleading and deceptive to speak of "limited risk" and "200-300" percent profits without also telling the reasonable listener that the overwhelming bulk of firm customers lose money. *See Ziemba*, 256 F.3d at 1206 (duty to disclose arises where a "defendant's failure to speak would render the defendant's *own* prior speech misleading or deceptive") (emphasis in original); *Rudolph v. Arthur Anderson & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986) (same); *see also Modlin v. Cane*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) 28,059, 49,550 (CFTC March 15, 2000) ("a reasonable investor who hires a broker . . . would clearly find it

---

[9] RJFCO's principal, Raymond Fitzgerald, testified that more than 95% of Defendants' customers lost money.

material to learn that that broker had never closed an account with a profit."); W. Page Keeton et al., Prosser and Keeton on Torts § 106 at 738 (5th ed. 1984) ("half of the truth may obviously amount to a lie, if it is understood to be the whole.").[10]

In its determination that there was no duty to disclose, the District Court was influenced by the fact that there was no evidence that other firms in the commodities industry did any worse than RJFCO and that RJFCO did not affirmatively represent that it had an attractive success rate. Given the highly misleading nature of the Commercial and Seminar, we fail to discern the legal significance of those facts in this case. As CFTC has persuasively argued, the Act should not foster a "race to the bottom," where liability for unquestionably deceptive activity is based in part on whether your competitors are not doing any better than you are. The focus of the inquiry is not on how well or how poorly others firms have done or even, in some circumstances, whether a firm has affirmatively boasted about a particular win-loss record. Rather, the judicial cross hairs in this case fall squarely on what the investor would reasonably want to know before deciding to commit money to a broker. *See, e.g.,* 17 C.F.R. § 33.7(f); *Sidoti,* 178 F.3d at 1136 n.3 (explaining that § 33.7(f) "bolsters" 17 C.F.R. § 33.10

---

[10] One RJFCO customer testified at trial that if he had been told during a telephone solicitation that about 96% of RJFCO customers lost money, he probably "would have hung up the phone."

25

by stating that standard risk disclosures do not relieve a broker from the obligation of disclosing all material facts to potential or existing options customers). This of course brings us back, as it should, to the underlying remedial purpose of the Act: protecting the individual investor from being misled or deceived in the highly risky arena of commodities investment. The omission of highly material information is pernicious because it strikes at the very core of individual autonomy. The law vigorously protects the right of private individuals to exercise free choice in the marketplace. Such freedom of choice is eviscerated, and the autonomy of the individual severely undermined, if decision-altering information is withheld.

D. Excessive Trading of Customer Accounts

CFTC argues that the district court erred by finding that Defendants did not excessively trade client accounts without regard to client interest, in contravention of the Act. We do not agree. This "churning" claim stems from a specific trading strategy developed by Defendant Kowalski in 1998 known as "synthetic futures." The details of that strategy were sufficiently explained in the District Court, *see* 173 F. Supp.2d at 1306-1309, and do not warrant repetition here. In order to succeed on a churning claim, CFTC had to establish that Defendants intentionally or recklessly traded client accounts in excess, without regard to client interest, and that Defendants controlled the accounts in question. *See, e.g., Patch v. Concorde*

26

*Trading Group, Inc.*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH)

26,253, 42,125 (CFTC Oct. 31, 1994).  Unlike the Commercial and the Seminar,

the churning claim is intimately connected with factual conclusions derived from

witness testimony and credibility assessments made at the bench trial.  For

example, the requisite element of control over customer accounts in this case is an

inquiry that turns upon the credit given to witnesses by the trier of fact.  We have

reviewed the District Court's analysis of this claim and cannot find that entering

judgment in favor of Defendants on this claim was erroneous.

    E.  "Controlling Person" Liability under the Act

    CFTC asserts that the District Court erred by finding Raymond Fitzgerald

not liable as a "controlling person" under the provisions of 7 U.S.C. § 13c(b).  We

agree. "A fundamental purpose of Section 13b is to allow the Commission to reach

behind the corporate entity to the controlling individuals of the corporation and to

impose liability for violations of the Act directly on such individuals as well as the

corporation itself." *JCC*, 63 F.3d at 1567 (internal quotations and citation omitted).

In order to succeed on a 13c(b) claim, CFTC must show that Defendant, as a

controlling person, did not act in good faith *or* knowingly induced, directly or

indirectly, the conduct which constitutes a violation of the Act.  To satisfy the latter

standard, CFTC must show that the controlling person had actual or constructive

knowledge of the core activities that make up the violation at issue and allowed them to continue. *Id.* at 1568. Section 13c(b), therefore, is about power, and imposing liability for those who fail to exercise it to prevent illegal conduct.

Applying this legal standard to the record, we conclude that Raymond Fitzgerald meets the criteria for 13c(b) liability. First, we note that Raymond Fitzgerald openly *concedes* that he was a "controlling person" at RJFCO. Appellees' Brief at 62. Raymond Fitzgerald was RJFCO's principal and exercised the ultimate choice-making power within the firm regarding its business decisions. *See* 173 F. Supp.2d at 1297. He reviewed and approved the activities that we hold today violated the Act and its regulations–the Seminar and the Commercial. He was ultimately responsible for compliance with all applicable rules on commodities solicitations. He had the power and the authority to prevent the Seminar from being conducted, or to alter its content to comply with extant law.

## IV. Conclusion

This case serves as a pungent reminder that *caveat emptor* has no place in the realm of federal commodities fraud. Congress, the CFTC, and the Judiciary have determined that customers must be zealously protected from deceptive statements by brokers who deal in these highly complex and inherently risky financial instruments. Upon review of the record and controlling law, we conclude

28

that the District Court erred in finding that the Commercial and the Seminar did not violate the CEA and its regulations. Both were deceptive and misleading, unquestionably material to the potential customer, and promulgated with the requisite scienter. These two solicitation devices also violate the Act because they failed to disclose extremely material information that any reasonable investor would want to know before committing money.

Raymond Fitzgerald is liable for the Commercial and Seminar under 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10. Leiza Fitzgerald is liable for her involvement with the Seminar under § 6c(b) and § 33.10. For purposes of this CEA violation by Leiza Fitzgerald, Raymond Fitzgerald is a controlling person and is liable under § 13c(b). RJFCO is liable for the individual violations of Raymond Fitzgerald and Leiza Fitzgerald pursuant to 7 U.S.C. § 2(a)(1)(B). As to all other Defendants, we will affirm the order of the District Court. We remand the matter for enforcement proceedings on the above violations by Raymond Fitzgerald, Leiza Fitzgerald and RJFC). To the extent that we did not discuss other points of error raised by CFTC or by Defendants, we deem them without merit. Each party to bear its own costs.

TJOFLAT, Circuit Judge, concurring:

I write separately only to underscore the extent of the misrepresentations committed by the defendants and to make a broader point about "clarity" – the two issues most troubling the dissent.

One particular passage in the dissent contains the essence of the dispute in this case: "The fact of the matter is, in options, you are either going to lose big or win big – that is why brokerage firms like RFJCO can advertise potential profits of up to 200 to 300% and must also warn that this type of investment involves a high risk of loss (only investment capital should be used)." The dissent evidently feels that by proclaiming that only "investment capital should be used," together with an equally generic disclaimer, a reasonable investor should be put on notice that commodities trading is extraordinarily volatile and the risk of loss enormous. Recognizing that "[c]ommodities brokerage firms need to disclose both the potential and risks involved in options trading," the dissent concludes that "RFCO does just that – disclosing the appropriate amount of profit potential as well as the adequate amount of risk."

The crux of my disagreement with the dissent, then, lies in the necessary congruence between claims of potential profit and the concomitant risk involved. The dissent evidently believes that commodities brokerage firms can advertise

30

about enormous profits (replete with constant repetition, explanation points, and satellite photographs of hurricanes) while making brief mention of the risk involved – a discussion of risk sugar-coated with assertions about how this risk can be "limited" while still providing "unlimited profit potential." In my view, such lopsided advertising is hardly a disclosure of the "the adequate amount of risk" as the dissent proclaims. It certainly failed to convey the *magnitude* of the risk involved (remember: 95% of the firm's clientele lost money on the advertised investments).

The deception regarding the substantial *risk* was compounded with more deception about how, precisely, the potential *gains* were going to be realized. The discussion about El Niño and urgency in the timing of the investment created an heir of inevitability – as if the defendant had some special knowledge with which to exploit an asymmetry of information in the market. All of this is fine, the dissent argues, so long as the advertiser skirts the line by peppering his language with conditional language ("could" and "may") and does not say that profits are *absolutely* inevitable. Viewed from the perspective of a reasonable investor – not an investment banker at Merrill Lynch or a futures specialist for ADM[1] – a misleading expectation of investment success can certainly be made even if

---

[1]The advertisement in this case was obviously aimed at the novice commodities investor.

conditional language is used.  This misleading picture is exactly the sort that the defendants painted.  Perhaps the dissent would rather have a world of *caveat emptor*: "If it is the case that investors '*surely*' wanted to know [information about the past success of the defendants' clients] before they invested, then why didn't they ask?" says the dissent.  But this is not the world Congress envisioned when it enacted the commodities laws.

The dissent further bemoans the lack of clarity in the law.  While it is undoubtedly true that the terms chosen by Congress – "defraud" and "deceive" – lack the precision necessary to guide behavior in all transactions, this "problem" is a necessary byproduct of the inherent difficulty in legal drafting.  Language of general applicability – the stuff of statutes and common law rules – is simply incapable of conveying the entire range of permissible and impermissible conduct.  The law is replete with nebulous phrases such as "proximate cause" and "rule of reason."  Some cases may entail *post hoc* judicial refinement, resulting in the unavoidable problem of a civil defendant without notice that his precise conduct could result in liability.

Whatever problems may be created by nebulous rules, I am confident that in this case, the defendants had ample notice that their heavily unbalanced portrait of options trading – a picture far different from reality – was impermissible.  When an

investor seeks to invest his money, he is principally concerned with two factors: return and risk. A rational investor with no peculiar aversion to risk would be indifferent between having $5 and a one-in-ten chance at winning $50. Change the risk factor to one-in-eighty and the bet becomes unattractive even to the most risk-seeking individual. The defendants in this case knew that by trumpeting enormous returns and downplaying the risk involved, a reasonable (if unsophisticated) investor would be enticed to make a bet that he would not otherwise make were the full picture disclosed. As the majority opinion points out, "it is misleading and deceptive to speak of 'limited risk' and '200-300' percent profits without also telling the reasonable listener that the overwhelming bulk of firm customers lose money." Don't make an active attempt to instill in the investor a grossly inaccurate picture of the risk-to-reward ratio. That is the rule in this case – a rule I find to be abundantly clear.

WILSON, Circuit Judge, dissenting:

I am troubled by the majority's holding, because it provides no useful guidance to commodities brokerage firms as to how to bring their solicitation and advertising activities into compliance with the law. Our case law already contains a confusing and vague definition of what constitutes "fraud" under the Commodities Exchange Act (CEA) and Commission Rule 33.10; the majority's opinion only adds to the uncertainty of this body of law. On this record, I would have found that R.J. Fitzgerald & Co. (RJFCO) was not involved in fraudulent solicitations, nor did they attempt to cheat, defraud, or deceive clients under Commission Rule 33.10. Therefore, I respectfully dissent.

## DISCUSSION

The majority contends that the statements made by RJFCO in the commercial and the promotional seminar "directly contravene the legal principles established in prior commodities fraud cases." The majority cites the following four cases to support its finding that RJFCO committed fraud: (1) *CFTC v. Trinity Fin. Group, Inc.*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,179 (CFTC Sept. 29, 1997), *aff'd in relevant part and vacated in part*, *CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir. 1999); (2) *In re JCC, Inc.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,080 (CFTC May 12, 1994), *aff'd*, *JCC, Inc. v. CFTC*, 63

34

F.3d 1557 (11th Cir. 1995); (3) *Bishop v. First Investors Group of the Palm Beaches, Inc.*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,004 (CFTC Mar. 26, 1997); (4) *In re Staryk*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,701 (CFTC June 5, 1996), *aff'd in relevant part and vacated in part*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,206 (CFTC Dec. 18, 1997).

A comparison of the facts of these four cases to the facts in this case should lead to the conclusion that RJFCO's statements are dissimilar and legally distinguishable from all four cases.

I. RJFCO did not falsely misrepresent profit potential or claim that seasonal trends practically guaranteed profits.

It is clear from prior case law that a broker registered as an associated person (AP) must not misrepresent the likelihood of profit to any current or prospective customer.  *See, e.g., In re JCC, Inc.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,576; *In re Staryk*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 45,809.  As the commission in *In re JCC, Inc.* stated, "[w]hen the language of a solicitation obscures the important distinction between the *possibility* of substantial profit and the *probability* it will be earned, it is likely to be materially misleading to customers." [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH)

35

at 41,576 n.23 (emphasis added).  More specifically, an AP must not represent that an anticipated seasonal trend, such as winter and summer, will "almost guarantee profits."  *Sidoti*, 178 F.3d at 1135–36.

For example, the APs in *Trinity Financial Group, Inc.* "misrepresented the profit potential of . . . commodity options by falsely telling . . . customers that they were practically guaranteed to make a profit because of the cyclical and/or seasonal nature of the gasoline and heating oil markets." [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 45,628.  One AP told a customer "that heating oil was cyclical in nature and that this was a pattern that he had seen over the past ten years, and that he had consistently made money on it."  *Id.*  Another AP said that "heating oil *always* went up during the winter and that if he invested $10,000, he would make $60,000 to $70,000 by the end of the year."  *Id.*  Yet another AP said that in the heating oil market "the trend is to buy in the summer months and sell it in the winter months.  And he made the analogy, . . . when do you buy a fur coat?  Do you buy a fur coat in the winter months or do you buy it in the summer months?"  *Id.*

In *In re JCC, Inc.*, the scripts given to the APs "often emphasized historical market moves that earned customers substantial profits, and encouraged customers

to anticipate similar profits." [1992-1994 Transfer Binder] Comm. Fut. L. Rep.

(CCH) at 41,576.  For example, one customer related that an AP told him that

> I should purchase a position in heating oil, that it was a sure thing that every Fall heating oil goes up.  It was guaranteed that I'd make $3,000 by Spring, no ifs, ands, or buts.  It was a sure thing. . . . After [the heating oil losses], he called me with the same story about crude oil and that time I was going to make $8,000.

*Id.*  The commission in *In re JCC, Inc.* held that,

> [g]iven the distorted view of the likelihood of profit and loss fostered by the blatant misrepresentations discussed above, such history-based statements do not escape our scrutiny merely because such a profit was possible, indeed, had actually been earned at a particular historical point . . . Without additional historical context, such as the frequency of the described market movement and whether market fundamentals or related circumstances have changed since the last occurrence, and some cautionary language about the difficulty of catching a market trend and escaping its reversal, customers can be misled by undue emphasis on such historical successes.  In the circumstances of this case, we find that JCC and EDCO's focus on such successes helped deceive their customers about the fundamental nature of the futures markets.

*Id.*

In *Bishop*, the customer was induced into opening an account as a result of

an AP's statements that based upon the history of the heating oil market, profits

were "*probable.*" [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) at

44,841.  The AP said that "based on the history of the heating oil market for the

past 12 years, I could make a lot of money in heating oil. . . . [P]eople had made a

lot of money buying before prices rose and selling after they had risen." *Id.* The commission found that "[t]hese types of representations made by [an AP] provide the deceptive message that the predictable nature of the seasonal demand and price trends essentially assured the likelihood of dramatic profits and far outweighed the risk of loss generally associated with trading commodity options." *Id.* What made the AP's statements so deceptive as to be "misleading half-truths" was the fact that the AP "failed to disclose that a seasonal increase in the demand for heating oil would not necessarily result in the increased value of a heating oil option, because the market had already factored seasonal demand into the price of an option." *Id.*

Lastly, in *In re Staryk*, an AP represented to his clients that "given the historical seasonal pricing trends in gasoline and heating oil, speculation in gasoline and heating oil options is significantly less risky and more likely to result in profits than speculation in those options tied to non-seasonal markets." [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 43,928. In fact, the AP claimed to customers that "the likelihood of the gasoline market going down in the summer is similar to the likelihood that someone would cancel the Fourth of July, cancel Memorial Day, or cancel summer vacations in schools in North America and in Europe." *Id.* at 43,929. The administrative law judge determined that those representations were "blatantly false":

38

seasonal shifts in demand (and the corresponding price changes) that generally characterize the physical markets for gasoline and heating oil, do not reduce the risks involved in trading energy options. No advantage is gained from knowledge of these seasonal patterns. . . . . . . It is only when unexpected events occur, including higher or lower than expected demand for gasoline, that an option may become profitable.

*Id.* at 43,930–31.

After reviewing these four cases, it is clear that RJFCO does not overstate the likelihood of profit or make claims that expected seasonal trends, compared to non-seasonal trends, will practically guarantee profits. The RJFCO commercial specifically focuses on El Niño, the effects of which one can hardly say were highly expected and predictable. RJFCO states that "[d]roughts, floods and other adverse conditions could dramatically alter the supply and demand dynamics of the corn market." Not only did El Niño have an unanticipated effect on the corn market compared to other seasonal trends in other commodities markets, but this weather phenomenon also had no history that RJFCO APs could utilize to boast of previous profits. This is contrary to the bold statements made by the APs in *Trinity*, who bragged that they had consistently made money on the heating oil market, or the APs in *In re JCC, Inc.*, who claimed that every fall heating oil goes up.

39

Nor does RJFCO's promotional seminar focus on anticipated, historical seasonal trends. In fact, the seminar script focuses on unanticipated trends such as abnormal weather phenomena (such as Hurricane Andrew, a drought, and floods), political conditions (specifically August of 1990 and the impending Gulf War), and new technical, hypothetical models (in which "[t]echnical analysts use trading volume and price study along with charts or computer programs to identify and project trends in the market"). Even when the script discusses the potential for profit in the heating oil market, RJFCO does not claim that the fluctuations in the demand for heating oil in the summer and winter will increase or decrease the price of an option or futures. Instead, the seminar focuses on unexpected events that may affect supply, such as storage facilities being depleted, pipelines being destroyed in Colombia and Northern Iran, and political events, such as the President of the United States dispatching the USS Nimitz to the Middle East.

The majority also contends that "the [s]eminar also impermissibly suggests that profits on options (the specific type of investment they were promoting) are proportionally related to the cash market." However, stating that profits on options is proportionally related to the cash market is not necessarily fraud. In fact, it is only when the AP asserts a one-for-one or greater correlation between profits and movements in the cash price of the commodity that fraud exists. *See CFTC v.*

40

*Commonwealth Fin. Group, Inc.,* 874 F. Supp. 1345, 1352 (S.D. Fla. 1994), *rev'd in part and vacated in part*, 79 F.3d 1159 (11th Cir. 1996) (unpublished table decision). RJFCO followed the Chicago Board of Trade's example. The Chicago Board of Trade's options manual explains that "a one-cent change in the futures price would result in only a half-cent change in the option premium." Therefore, when RJFCO explains in its script that by using an option, a twenty-two cent move in heating oil "could be 50-75% of the profit that the future would have earned," RJFCO is assuming that a one-cent change in the futures price would result in only a half-cent change in the futures price. As the equation concludes, the script provides: "Now remember that profit is on a futures contract, and if you had a less aggressive option, because you want limited risk so you would receive *50%* of that profit – 46200 divided by 2 equals $23,100." RJFCO never asserts that profits on options directly move in relation to the cash market for the commodity.

II. <u>RJFCO did not downplay or minimize the degree of risk involved in investing in commodity options.</u>

*Clayton Brokerage Co. of St. Louis v. CFTC*, 794 F.2d 573, 580 (11th Cir. 1986) (per curiam)*,* tells us that "[t]he extent of disclosure necessary to provide full information about risk will vary depending on the facts and circumstances of trading as well as on the nature of the relationship between the broker and the

41

customer." This standard leaves a lot to be desired and provides courts with a significant amount of discretion as to what constitutes sufficient disclosure of risk. However, several cases, including *Sidoti*, *In re JCC, Inc.*, and *In re Staryk*, provide us with some guidance as to how this standard is to be applied.

The majority extends the principles of law articulated in these cases into a set of facts where these principles should not apply. It reaches overly broad conclusions, such as "the Commercial overemphasizes profit potential and downplays risk of loss," and "[the seminar] presents a distinctly unbalanced picture between the potential for profit and the potential for loss in options, inflating one while downplaying the other," without grappling with the particular set of facts involved in the instant case. These conclusions are not supported by this record, nor is the legal standard underlying them supported by our precedent.

In *Clayton Brokerage Co. of St. Louis*, APs made affirmative misrepresentations as to risk; customers were told to "ignore the risk disclosure statement," "that certain trading strategies can limit losses," and "that the broker's scheme can overcome inherent markets risks, or that certain commodities are less volatile." *Id.* at 580–81.

In *Sidoti*, the APs downplayed the degree of risk by telling customers that the risks of trading "commodity options were non-existent or minimal." 178 F.3d at 1135–36.

In *JCC, Inc.*, former APs testified that they were taught "to minimize risk, . . . to characterize the $2500 management fee as insignificant compared to potential profits, and to use the Regulation 1.55 risk disclosure statement as a sales tool by explaining away various paragraphs of the document as inapplicable to the FLT program." 63 F.3d at 1568. Customers were told that "they could lose no more than $500 in the sugar market," "that foreign currencies were much safer than grain trading because of the guarantees of the movements in the currencies," and that "we actually had very little risk at all." *In re JCC, Inc.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,576.

In *In re Staryk*, although the AP would disclose risk, he would always downplay it by emphasizing the predictability of the price fluctuations in gasoline and heating oil. [1994-1996 Transfer Binder] Comm. Fut. L. Rep.(CCH) at 43,929. The administrative law judge determined that although the AP "remind[ed] customers that past performance may not guarantee success in the future, this generic warning of risk is almost always juxtaposed with information and statements which convey that this risk is in fact small." *Id.*

43

The disclosures of risk that were employed in *Clayton Brokerage Co. of St. Louis*, *Sidoti*, *In re JCC, Inc.*, and *In re Staryk* are distinguishable from the risk disclosures provided by RJFCO in the instant case.[1]  In its television commercial, RJFCO attempted to explain the risk to potential customers in four separate ways. The first, most obvious risk disclosure statement made by RJFCO was the statement found on the bottom one-fourth of the screen, which was kept on the screen for forty-five of the sixty seconds of the commercial's running time.  This statement, displayed in bold capital letters directly above RJFCO's phone number, provided: "OPTIONS INVESTING INVOLVES A RISK OF LOSS.  MINIMUM ACCOUNT $5,000."  Any viewer who jotted the phone number down would have seen the prominent risk disclosure statement displayed above the number.

The second disclosure statement flashed on the screen three seconds after the commercial began.  It provided in bright yellow letters: "The preceding were hypothetical mathematical samples of leverage in the Commodity Options

---

[1] It is worth noting that the seven customers who testified against RJFCO acknowledged that they understood the level of risk involved in trading commodities.  Several of these customers either maintained/traded stock and mutual fund investments or studied commodity futures.  Most of RJFCO's customer base consisted of people who had themselves first inquired into commodity trading; they were not sought out.

It was also determined at trial that all seven of these customers received and had an opportunity to review the risk disclosure booklet before opening an account.  The risk disclosure booklet explained the amount of risk involved in options trading.  The customers were also advised that only risk capital should be invested in this kind of market. And each customer approved every trade before any trade was placed by an RJFCO AP.

Market."  This disclosure clarifies the point that RJFCO's prediction was based upon a hypothetical that is not guaranteed to come true.

Third, and perhaps most important, the commercial is filled with conditional language – nothing is guaranteed.  RJFCO is equivocal in its advertising – none of the language in the commercial suggests that El Niño *will definitely* affect the corn market as predicted and that customers *will* receive huge profit.  Rather, the following conditional statements were made: "[El Niño's] effect on world crops *could* mean huge profits in the grain markets."  "[C]onditions *may* exist for profits as high as 200 to 300 percent."  "[*I*]*f* patterns continue, the effects *could be* devastating," and "adverse conditions *could* dramatically alter the supply and demand dynamics."[2]

And finally, in the middle of the commercial, the announcer changes his tone (the voice drops) and we hear, "*[o]ption investing involves a high risk of loss and only risk capital should be used.*"  The concurring opinion suggests that this disclosure is inadequate to state the risk.  How much more warning is required than

---

[2]RJFCO's chief market analyst studied the various commodities markets and developed a reasoned trading strategy.  RJFCO's trading strategy was based on, as the district court found, "deliberate research and logical assumptions and the strategy was developed primarily to yield profit for RJFCO clients, not simply to generate commissions."  *CFTC v. R. J. Fitzgerald & Co.*, 173 F. Supp. 2d 1295, 1307 (M.D. Fla. 2001).  Numerous reports from a variety of prominent and respected financial and meterological sources were examined to develop the strategy predictions.

a disclosure that the investment is a "*high risk*"?  This flagrant risk disclosure

statement, which is hardly brief within the format of the commercial, combined

with the "RISK OF LOSS" statement conspicuously prominent on the screen

throughout almost the entire commercial, the other statement explaining RJFCO's

mathematical formula, and the conditional language placed throughout the

commercial, effectively and sufficiently discloses the magnitude of risk involved.

As for the promotional seminar, once again I find that there is an adequate

amount of risk disclosure.  One need only compare the seminar with the National

Futures Association's (NFA's) manual[3] to see that RJFCO thoroughly disclosed risk

according to the NFA's suggestions.

For example, RJFCO's promotional seminar provides: "In contrast to futures,

options on futures allow investors and risk managers to define risk and limit it to the

loss of a premium paid for the right to buy or sell a futures contract, while still

providing the buyer with unlimited profit potential."  The NFA manual provides:

> For the individual who has a price opinion (that a particular futures
> price will change by at least some given amount in a certain direction
> within a specific period of time), buying options offers the
> opportunity to realize substantial profits with a predefined and limited
> risk.  The maximum an option buyer can lose – should events prove

---

[3] The NFA's manual, which was admitted into evidence at trial and is part of the record on appeal, provides an introduction to options on futures contracts, how they work, and the opportunities and risks associated with their purchase.  The NFA is a self-regulatory organization in the futures industry.

him wrong about the direction, extent or timing of the price change – is the premium paid for the option plus commissions and other transaction costs.[4]

The majority takes exception to the following assertions regarding unlimited profit potential and limited risk in options found in RJFCO's seminar: "If you are highly aggressive and looking for unlimited profit potential as well as unlimited risk than [sic] it would be the futures. But most would like something less aggressive, something offering unlimited profit potential but limited risk-option trade." The NFA manual confirms this for it provides: "[U]nlike an option which has limited risk, a futures position has potentially unlimited risk."

Now, if the "limited risk with unlimited profit potential" had been "recited repeatedly as a sales inducement," then these true statements could have become fraudulent in that the representation begins to "inflate the *likelihood* of profit while minimizing the risk of loss." *In re Staryk,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 45,809. That, however, is simply not the case here – the seminar does not overemphasize profit and downplay risk of loss. Rather, the introduction to the seminar provides, "These markets are risky – we want you to go

---

[4] This explains that RJFCO's calculations in its profit illustration that the majority claims are false – "Now remember that profit is on a futures contract, and if you had a less aggressive option, because you want limited risk so you would receive approximately 50% of that profit-46200 divided by 2 equals $23,100" – are actually possible according the NFA's manual. A less aggressive option on a futures contract does create limited risk.

47

away with ideas on how to limit your risk but still be positioned to take advantage of the volatility that not only make them exciting but potentially very profitable." RJFCO actually mentions loss *first*, noting how options on futures contracts can limit this risk, and *then* mentions potential profit (not guaranteed or probable profit). Practically every affirmative representation on profit is counterbalanced with a risk warning. ("Past price action can provide you with clues to future action. The market is anticipatory, and you can see price movement first in the chart for the day." The next paragraph then warns: "Chart signals, just like fundamental news can be misleading. You should have structure in you[r] approach to the markets.")

Since I find no misleading or deceptive statements made by RJFCO in its commercial or seminar, there is no need to examine scienter and materiality. However, it bears mentioning that the majority found RJFCO to have "acted recklessly with regard to the statements aired on television." The majority based this recklessness

> on the fact that this Court and the CFTC have previously condemned attempts to attract customers by: (1) linking profit expectations on commodities options to known and expected weather events, seasonal trends, and historical highs; (2) suggesting that the commodities market can be correctly timed to generate large profits; and (3) substantially inflating option profit expectations while downplaying risk of loss.

I find no prior precedent supporting these contentions. At the most, these statements are oversimplifications of prior cases. Linking profit expectations on commodities options to known seasonal trends is only fraud if the AP "almost guarantees profits," as in *Sidoti*, or "distorts the likelihood of profit," as in *In re JCC, Inc*. Suggesting that the commodities market can be correctly timed to generate profits is not necessarily fraud when, as stated in *In re Staryk*, "[i]t is only when unexpected events occur, including higher or lower than expected demand for gasoline, that an option may become profitable." [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 43,931. And the majority's buzz phrase, "substantially inflating option profit expectations while downplaying risk of loss," is much too vague and abstract a standard to be of any use to commodities brokerage firms who wish to advertise their services in the future.

The difficulty with the current standard for commodity options fraud is that Rule 33.10 is too vague. According to the majority opinion, in order to establish a fraud claim in an enforcement action under the CEA, the CFTC must prove: "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality."[5] Therefore, much of the case law from this

---

[5] While customer reliance on the misrepresentation need not be proven in a CFTC enforcement action alleging fraud, it is essential to restitution relief sought to compensate the injured party. *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000).

standard has been both arbitrary and conflicting. Additional guidelines must be introduced to further clarify the elements of fraud under Rule 33.10.

Courts have had the most difficulty in determining what constitutes a material misrepresentation or a material omission. According to the majority opinion, "whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" As for materiality, a statement is considered material if "there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 111 (2d Cir. 1986). Unfortunately, Rule 33.10 and case law do not provide adequate guidance to either the CFTC or commodity futures brokerage firms.

While every claim of commodities fraud must be reviewed on a case-by-case basis under the existing standard, a more specific interpretation of the elements under Rule 33.10 would create a standard whereby "material misrepresentations or material omissions" would be more readily discernible.

What constitutes a "material misrepresentation"?

(1) The most obvious material misrepresentations are outright falsehoods told by brokerage firm APs and sales staff to prospective or current customers. Examples of blatant material misrepresentations include promising to open a trading

account and not doing so, reporting erroneous account balances, or making unlawful trades in a customer's account without his or her authorization. *See CFTC v. Muller*, 570 F.2d 1296, 1300–01 (5th Cir. 1978) (finding evidence sufficient to support an injunction because AP lied concerning opening of bank account and supplied fictitious options trade statements). A material misrepresentation also occurs if an AP lies about the amount of profits earned, or losses accrued, in a customer's trading account. *See CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000) (finding fraud because the AP reported trading profits when no profits had been earned and failed to report losses on trades he was not authorized to make).

(2) A material misrepresentation that is not patently obvious, but just as damaging, exists when a brokerage firm deliberately overstates profit potential and conceals the possibility of loss. Any prediction or recommendation must have a reasonable basis in fact and should be explicitly labeled just that – a prediction and not a guarantee. A statement regarding potential profits that could be earned should not be considered a material misrepresentation or misleading statement if it is possible that these projected earnings could realistically occur.

For example, RJFCO informed customers of the potential for profits up to 300% if the El Niño atmospheric disturbances occurred as projected. If this profit

51

potential was attainable, and RJFCO compiled significant research which suggested climactic conditions created by the El Niño phenomenon could create drought and thereby increase the price of grain due to its scarcity, then RJFCO's marketing strategy did not represent a material misrepresentation.

Existing case law reflects situations, unlike RJFCO, where other firms made unwarranted profit predictions which were considered to be inherently fraudulent due to an absence of technical research or proof to back up these claims. *See CFTC v. J.S. Love & Assocs. Options, Ltd.*, 422 F. Supp. 652, 660 (S.D.N.Y. 1976); *In re British Am. Commodity Options Corp.*, Nos. 76-15 and 77-3 (C.F.T.C. Dec. 2, 1977), noted in [1977-1980 Transfer Binder] Comm. Fut. L. Rep. ¶ 20,526 (C.F.T.C. Dec. 2, 1977), avail. on Westlaw FSEC-Admin. DATABASE, 1977 WL 13558, at *11–12.

(3) Also, any claim about a brokerage firm's past trading record or an AP's puffing of past successes should be based upon actual trades executed in the market place and should fairly represent results achieved for those periods. *CFTC Interpretative Letter* No. 77-16 [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,498, 22,065 (Oct. 18, 1977); *see Clayton Brokerage Co. of St. Louis*, 794 F.2d at 575 (finding fraud when AP boasted of his successes and none of his failures); *Commonwealth Fin. Group, Inc.*, 874 F. Supp. at 1353 (where

salespeople misrepresented the past success of themselves and their firm by telling prospective customers that current clients have "recently doubled their money" and that the firm "has the best track record in the industry and has made millions of dollars in profits for their customers with little risk").

What constitutes a "material omission"?  Omissions of material fact are rarely transparent and perhaps more subject to questionable interpretation than even material misrepresentations.

For example, a brokerage firm must disclose to potential and current customers the amount of risk inherent in commodity futures and options trading. However, an undefined, grey area exists between no disclosure and full disclosure. If  there is no mention of risk on the part of the brokerage firm, then a material misrepresentation exists – options trading is a risky business, and customers need to be told about the possibility of losing their entire investment.  The mandatory risk disclosure statement required by the CFTC puts the customer on notice of the risks of trading; however, in some instances this disclosure statement is contradicted by oral representations made by APs who tell customers to disregard this statement. *See Clayton Brokerage Co. of St. Louis*, 794 F.2d at 580; *In re JCC, Inc.*, 63 F.3d at 1568 (where the risk disclosure statement was explained away as "inapplicable"); *but see Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1019 (5th

Cir. 1990) (finding that the written risk disclosure statement was sufficient enough to inform the Pucketts of the risks involved because Dr. Puckett, an educated and successful businessman who had traded securities for more than thirty years, was capable of understanding the risk disclosure statement, and admitted that he affirmatively sought risk in order to make profits).

Therefore, in order to avoid any misunderstanding or charges of misrepresentation, it would be preferable for brokerage firms to err on the side of caution and provide both written and oral disclosure statements to potential investors. If not, these firms may leave themselves open to charges that they fraudulently omitted material statements regarding risk of loss. *See CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F. Supp. 911, 916 (S.D.N.Y. 1977) (holding that the commodity options sales presentations at issue were fraudulent because they "conveyed the distinct impression that extraordinary short-term profits were all but certain to be realized by investors" and because the mechanics of commodity options trading were misrepresented).

These guidelines are merely suggestions, on my part, on how to both interpret the existing standard and provide the commodities industry with additional safeguards to ensure the legality of their sales presentations, promotional seminars, and conduct while maintaining their customers' trading accounts.

## III.  RJFCO had no affirmative duty to disclose its trading record.

The majority implies in its opinion that RJFCO had a duty to disclose its previous track record to prospective customers.  However, the majority fails to point to any prior authority that suggest that there is a specific affirmative duty on the part of a commodities brokerage firm to disclose its prior track record.  The cases in the majority opinion suggest that a duty to disclose arises *only* if the firm's statements would be misleading or deceptive if it did not disclose its track record. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001) (We recognize a duty to disclose when "a defendant's failure to speak would render the defendant's *own* prior speech misleading or deceptive"); *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986) ("[A] defendant's omission to state a material fact is proscribed *only* when the defendant has a duty to disclose") (emphasis added).  Simply put, there is no mandatory duty to disclose.

The majority argues that a reasonable investor would "*surely*" want to know how many RJFCO investors had lost money, and, therefore, it was RJFCO's duty to tell them.  If it is the case that investors "*surely*" wanted to know this information before they invested, then why didn't they ask?  This is not a case where the APs misrepresented the firm's track record or lied about successes in the past. *See Modlin v. Cane*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,059

at 49,549-50 (CFTC Mar. 15, 2000) (The AP told customers "his method of trading was successful" and was "the key to making money," and "that he would jump into the East River if he was unable to generate a profit."). RJFCO never made any bold misrepresentations regarding its prior track record and, therefore, was under no duty to disclose its record.

## CONCLUSION

Commodities brokerage firms need to disclose both the profit potential and risks involved in options trading. RJFCO does just that – disclosing the appropriate amount of profit potential as well as the adequate amount of risk.

Trading options on futures contracts is *inherently risky*. The fact of the matter is, in options, you are either going to lose big or win big – that is why brokerage firms like RJFCO can advertise potential profits of up to 200 to 300% and must also warn that this type of investment involves a high risk of loss (only risk capital should be used).

Admittedly, under *Sidoti*, *In re JCC, Inc.*, *Bishop*, and *In re Staryk*, the standard for fraud is vague. However, these cases at least provide a sensible set of guidelines for brokerage firms to follow in designing their solicitations and advertising programs. Essentially, these cases suggest that brokerage firms must not misrepresent or guarantee profits, nor minimize the degree of loss. However, in

56

this case, the majority has extended the standard to apply to a situation where a firm did not misrepresent or guarantee profits and in fact disclosed the amount of risk involved.[6]  And the majority opinion simply fails to offer any useful guidance to actors in this area of the law.

Commodities brokerage firms should be on the alert – this decision may make it difficult to advertise and solicit business in the future.  It is uncertain what subsequent advertising language may "overemphasize profit and downplay risk of loss."  I dissent.

---

[6]No customer suffered a loss beyond his or her initial investment.